Elizabeth KINNEY, Glenn Niman, Daniel C. Sullivan, Diane Fatula, Cassie James, Erik Von Schmetterling, John Gladstone, Tom Levine, Charles Homiller, Rona Schnall, Mary Barnes, Ann McLaughlin, Disabled in Action of Pennsylvania,

v.

Harold YERUSALIM and Alexander Hoskins.

Civ. A. No. 92–4101.

United States District Court, E.D. Pennsylvania.

Feb. 2, 1993.

Stephen F. Gold, Philadelphia, PA, for plaintiffs.

Barry Kramer, Office of Atty. Gen., Philadelphia, PA, for Harold Yerusalim.

Deborah M. Russo, Asst. City Sol., City of Philadelphia Law Dept., Philadelphia, PA, for Alexander Hoskins.

MEMORANDUM

BARTLE, District Judge.

Plaintiffs, disabled individuals who reside and work in Philadelphia, have filed this class action against Howard Yerusalim, Secretary of the Pennsylvania Department of Transportation (PennDOT), and Alexander Hoskins, Commissioner of the Streets Department of the City of Philadelphia ("City"), under the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*[1] Plaintiffs seek to compel the City to install "curb ramps" or "other sloped areas" on all streets which the City has resurfaced since January 26, 1992, the effective date of the ADA. Before the Court are the parties' cross-motions for summary judgment pursuant to Rule 56(c) of the Federal Rules of Civil Procedure.

Rule 56(c) provides for the entry of summary judgment where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact...." *See, Celotex Corporation v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In 1992, Congress passed the ADA to address the problem of discrimination against persons with disabilities. Specifically, the ADA prohibits discrimination in employment (Title I), in public services and public transportation (Title II), in public accommodations (Title III), and in telecommunications (Title IV). Title II of the ADA, 42 U.S.C. § 12131 et seq., which is the subject of this dispute, provides:

> No qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132. Rather than outline the specific obligations of public entities under this section, the ADA directed the Department of Justice ("DOJ") to promulgate regulations consistent with the anti-discrimination provisions of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Rehabilitation Act"), and the regulations promulgated thereunder by the DOJ. 42 U.S.C. § 12134. The Rehabilitation Act prohibits discrimination against handicapped individuals by any program receiving public funds.

The removal of architectural barriers to the disabled, and particularly the installation of curb ramps or slopes, was a major concern of Congress in passing the ADA. In the ADA's statement of purpose, Congress specifically identified the "discriminatory effects of architectural ... barriers ..." as one of the evils which the ADA was intended to address. 42 U.S.C. § 12101. To this end, the DOJ in its regulations established a scheme intended ultimately to create a society providing physical accessibility to persons with disabilities. The regulations under Title II attempt to accomplish this goal by means of a two-tiered process which distinguishes between a public entity's responsibilities concerning "existing facilities" on the one hand, and "new construction or alterations" on the other.

With respect to *existing* facilities, public entities are not required to modify each facility to provide for access by individuals with disabilities, but must operate all programs, services and activities in a manner such that, when viewed in its entirety, each service or program is "readily accessible to and usable by individuals with disabilities ..." 28 C.F.R. § 35.150(a). Furthermore, this section provides an undue burden defense, stating that a public entity is not required "to take any action that it can demonstrate would result in a fundamental alteration in the nature of a service, program, or activity or in undue financial and administrative burdens." 28 C.F.R. § 35.-150(a)(3).

Although public entities may comply with the program accessibility requirements for existing facilities in several

ways, the regulations specifically mandate the installation of curb ramps. The ADA regulations provide that "if a public entity has responsibility or authority over streets, roads or walkways, its transition plan shall include a schedule for providing curb ramps or other sloped areas where pedestrian walks cross curbs, giving priority to walkways serving entities covered by the Act ..." 28 C.F.R. § 35.150(d)(2). All such changes to facilities must be made within three years of January 26, 1992. 28 C.F.R. § 35.150(d).

In contrast, the regulations are more demanding with respect to new construction and alterations. They require that when the entity undertakes to engage in new construction or to make alterations to existing facilities it must take that opportunity to make its facilities accessible. 28 C.F.R. § 35.151 states:

(a) *Design and construction.* Each facility or part of a facility constructed by, on behalf of, or for the use of a public entity shall be designed and constructed in such manner that the facility or part of the facility is readily accessible to and usable by individuals with disabilities, if the construction was commenced after January 26, 1992.

(b) *Alteration.* Each facility or part of a facility altered by, on behalf of, or for the use of a public entity in a manner that affects or could affect the usability of the facility or part of the facility shall, to the maximum extent feasible, be altered in such manner that the altered portion of the facility is readily accessible to and usable by individuals with disabilities if the alteration was commenced after January 26, 1992.

Furthermore, this section also specifically requires the installation of curb ramps:

(1) Newly constructed or altered streets, roads, and highways must contain curb ramps or other sloped areas at any intersection having curbs or other barriers to entry from a street level pedestrian walkway.

(2) Newly constructed or altered street level pedestrian walkways must contain curb ramps or other sloped areas at in-

tersections to streets, roads, or highways.

28 C.F.R. § 35.151(e). Plaintiffs contend that resurfacing a street constitutes an "alteration" under this provision and that the City is therefore obligated to provide curb ramps or slopes on all streets which have been resurfaced since the effective date of the statute, January 26, 1992.

The regulations' special emphasis on the installation of curb ramps is not hard to understand. Without curb ramps or slopes, it is extremely difficult, if not dangerous, for persons in wheelchairs and other persons with disabilities to perform the essential task of crossing the street. Because the wheels of wheelchairs are sensitive to obstacles, curbs without ramps or slopes present the danger that the chair will overturn, injuring the occupant. Consequently, disabled persons are sometimes obligated to navigate their chairs in the street, exposed to the peril of traffic. Without the ability to cross streets, the opportunities afforded by the ADA are of little benefit. The disabled are severely limited in their ability to obtain employment and recreation and otherwise to participate fully in society. As the House Report explained, "[t]he employment, transportation, and public accommodation sections of [the ADA] would be meaningless if people who use wheelchairs were not afforded the opportunity to travel on and between the streets." H.Rep. 485(II), 101st Cong., 2d Sess. 84 (1990), U.S.Code Cong. & Admin.News 1990, 267, 303, 367.

The City does not dispute the importance of installing curb ramps. The City installs ramps or slopes whenever work is performed on the curb and plans eventually to install ramps or slopes throughout the City, as required by the "existing facilities" provisions of Title II. The City contends, however, that merely resurfacing a street is not an "alteration" which triggers the application of 28 C.F.R. § 35.151(e), and therefore resurfacing a street does not require the installation of curb ramps or slopes.

The City first asserts that the obligations under the "alterations" section of the regu-

lations apply only to the altered portion of the facility. In other words, because resurfacing affects only the street, it does not trigger an obligation to alter the curb. In support of this argument, defendant point to 28 C.F.R. § 35.151(b) which provides that alterations must be performed in a manner such that "*the altered portion* of the facility is readily accessible to and usable by individuals with disabilities ..." (emphasis added). Nonetheless, section 35.-151(e)(1) specifically provides that "[n]ewly constructed or altered *streets* ... must contain curb ramps" (emphasis added). This more specific regulation supersedes the more general provision of § 35.151(b)(1). According to Webster's Third New International Dictionary, to alter something is "to cause something to become different in particular characteristic (as measure, dimension, course, arrangement or inclination) without changing it to something else." The regulations enacted pursuant to Title II of the ADA do not define the term "alteration" except to state that when a facility is altered in a manner which "affects or could affect the usability of a facility," the altered portion shall be made accessible. 28 C.F.R. § 35.151(b). The Americans with Disabilities Act Accessibility Guidelines for Buildings and Facilities ("ADAAG"), which was adopted by the DOJ as a standard for compliance with the accessibility requirements of the ADA, also defines "alteration" in terms of affecting usability:

> an alteration is a change to a building or facility made by, on behalf of, or for the use of a public accommodation or commercial facility, *that affects or could affect the usability of the building or facility* or part thereof. Alterations include, but are not limited to, remodeling, renovation rehabilitation, reconstruction, historic restoration, changes or rearrangement of the structural parts or ele-

ments, and changes or rearrangement in the plan configuration of walls and full-height partitions. Normal maintenance, reroofing, painting or wallpapering, or changes to mechanical and electrical systems are not alterations unless they affect the usability of the building or facility.

28 C.F.R. Pt. 36, App. A (emphasis added).[2] The parties have cited no case, and we have found none, interpreting the phrase "affecting usability."

Defendants rely on *Disabled in Action v. Sykes*, 833 F.2d 1113 (3d Cir.1987), *cert. denied*, 485 U.S. 989, 108 S.Ct. 1293, 99 L.Ed.2d 503 (1988), for the proposition that the relevant question in determining what constitutes an alteration should be "to what extent any alterations to a facility provide an opportunity to make the facility more accessible to handicapped persons." *Sykes* at 1120. *Sykes* construed a similar, but not identical regulation promulgated by the Department of Transportation ("DOT") under the Rehabilitation Act which defines an alteration as a change which "affect[s] the *accessibility* of the facility." 49 C.F.R. § 27.65(a) (emphasis added). Defendants read the *Sykes* case to hold that unless the alteration itself affords an opportunity to provide for accessibility, no requirement is triggered. In the present case, however, the express language of the applicable regulations and the analysis by the DOJ call for a different interpretation. The regulations under Title II provide that the accessibility requirements are triggered whenever an alteration "affects or could affect the *usability* of a facility." 28 C.F.R. § 35.-151(b) (emphasis added). This differs from the regulations in *Sykes* which applied to alterations which affected the *accessibility* of the facility. In its analysis of an almost identical provision under Title III of the ADA[3], the DOJ made clear that the con-

---

**2.** The regulations also adopt the Uniform Federal Accessibility Standards ("UFAS"), Appendix A to 41 C.F.R. § 101–19.602(b), as alternate standards by which entities may comply with the accessibility requirements of the ADA. The UFAS definition of "alteration" however is expressly made applicable only to "buildings and structures" and is thus not relevant to this inquiry.

**3.** The DOJ provided only minimal analysis of the "alterations" sections of the Title II regulations. However, its analysis of the almost identical provisions under Title III is applicable here. The legislative history suggests that the con-

cept of "usability" should "be read broadly to include any change that affects the usability of the facility, not simply changes that relate directly to access by individuals with disabilities." 28 C.F.R. Pt. 36, App. B. Furthermore, as explained above, the express language of the regulation at issue, which provides for the installation of curb ramps whenever the *street* is altered, precludes an interpretation that only the alteration itself must be made accessible.

The legislative history of the ADA provides some examples of changes which would "affect usability" under Title III. The report of the House Committee on Education and Labor states:

> [t]hat such alterations must or could affect usability means that minor changes such as painting or papering walls, replacing ceiling tiles, and similar alterations that do not affect usability or access do not trigger the requirement that the altered areas must be made accessible or that the path of travel and bathrooms and other facilities must be made accessible.
>
> Changes to floors may or may not affect accessibility or usability, depending upon the nature of the change involved. Routine maintenance, repairing and sanding floors, and other minor changes to floor surfaces would generally not affect usability and accessibility
>
> . . .
>
> Other changes to floors, such as totally replacing a floor or installing a brick or stone floor, may be so substantial an undertaking and so connected to usability and accessibility as to trigger the requirement that the altered area be made accessible and that the path of travel and bathrooms be made accessible....

H.Rep. 485(II), 101st Cong., 2d Sess. 111–112 (1990), U.S.Code Cong. & Admin.News 1990, 394–395.

Whether resurfacing a street constitutes an "alteration" is thus dependent on whether resurfacing affects the usability of the street. We think that it does. As stated above, the DOJ has indicated that the concept of usability should be read broadly. The ADA is a remedial statute, designed to eliminate discrimination against the disabled in all facets of society. As a remedial statute it must be broadly construed to effectuate its purposes. *Tcherepnin v. Knight*, 389 U.S. 332, 335, 88 S.Ct. 548, 553, 19 L.Ed.2d 564 (1967). Unlike merely painting a wall or polishing a floor, resurfacing affects the street in ways integral to its purpose. Resurfacing makes driving on and crossing streets easier and safer. It also helps to prevent damage to vehicles and injury to people, and generally promotes commerce and travel. The surface of a street is the part of the street that is "used" by both pedestrian and vehicular traffic. When that surface is improved, the street becomes more usable in a fundamental way.

Furthermore, the process of resurfacing entails more than minor repair work or maintenance. According to the parties, City streets generally consist of three layers, a sub-base consisting of stone, a base consisting of concrete, and a top layer of asphalt. While sometimes new asphalt may simply be overlaid on top of the old surface, more often the old asphalt is removed by a process known as "milling." Milling consists of removing and then replacing the top layer of asphalt with the use of heavy machinery. This process may require either that the entire surface from curb to curb be removed, or that seven or eight feet from either curb may be removed, depending on the nature of the street. During this process any necessary reconstruction will be performed, for example any cracks in the concrete base of the road will be repaired and manholes may be

Title II provisions should be read consistently with the Title III provisions. The House Report states "The Committee intends ... that the forms of discrimination prohibited by [Title II] be identical to those set out in applicable provisions of Titles I and III of this legislation" H.Rep. 485(II), 101st Cong.2d Sess. 84 (1990), U.S.Code Cong. & Admin.News 1990, 367, and

further, "Title II should be read to incorporate provisions of Titles I and III which are not inconsistent with the regulations implementing Section 504 of the Rehabilitation Act of 1973 ..." H.Rep. 485(III) 101st Cong.2d Sess. 51 (1990), U.S.Code Cong. & Admin.News 1990, 445, 474.

raised or lowered to be flush with the street when the resurfacing is complete. We conclude that resurfacing a street is an alteration within the meaning of the regulations and triggers the obligation to install curb ramps or slopes.

■ The City contends that if resurfacing is an "alteration" it is entitled to assert an "undue burden" defense to the requirement of installing curb ramps. The City relies on § 35.150(3) which provides that a public entity is not required "to take any action that it can demonstrate would result in a fundamental alteration in the nature of a service, program, or activity or in undue financial and administrative burdens." This provision, however, is found under the section of the regulations governing "existing facilities," 28 C.F.R. § 35.150. It is separate and distinct from the provisions governing "new construction and alterations" under 28 C.F.R. § 35.151. There simply is no general "undue burden" defense in the ADA. It is provided only in limited circumstances. For example, Title III of the ADA specifically provides that an entity is excused from the "path of travel" requirements if the cost of compliance would be disproportionate to the cost of the alteration. 28 C.F.R. § 36.403. However, the general "alterations" provisions of Title III contain no such defense.

The distinction between the requirements under the "existing facilities" and "alterations" provisions is logical. The "existing facilities" provisions mandate that public entities make all their services and programs as a whole accessible to the handicapped. The regulations do provide an undue burden defense in recognizing that, in some instances, the requirement to modify existing programs and facilities may impose extraordinary costs on the community. In contrast, new construction and alterations present an immediate opportunity to provide for accessibility. We can only conclude that Congress and the DOJ made the determination that when a public entity decides to engage in new construction or to make alterations, it is not an undue burden to require it to provide for accessibility at that time. Congress realized that these requirements might pose difficulties for financially strapped state and local governments, but determined that the overall long term benefit to society outweighed the costs. The House Judiciary Committee explained:

> While integration of people with disabilities will sometimes involve substantial short-term burdens, both financial and administrative, the long-range effects of integration will benefit society as a whole. The general prohibitions set forth in the Section 504 regulations, are applicable to all programs and activities in Title II. The specific sections on employment and program access *in existing facilities are subject to the 'undue hardship and undue burden' provisions of the regulations which are incorporated in Section 204. No other limitations should be implied in other areas.*

H.Rep. 485(III), 101st Cong., 2d Sess. 50 (1990) U.S.Code Cong. & Admin.News 1990, 473 (emphasis added).[4]

■ Finally, we must determine whether the City is obligated to install curb ramps on all streets on which the resurfacing was performed after January 26, 1992, the effective date of the statute, or on only those streets which were "bid" after that date. 28 C.F.R. § 35.151 provides that the requirements of that section apply to construction and alterations which were commenced after January 26, 1992. However, the DOJ's analysis of this section provides, "[f]acilities under design on that date will be governed by this section if the date that bids were invited falls after the effective date." 28 C.F.R. Pt. 35, App. A. Plaintiffs contend that the DOJ analysis is inapplicable, because the installation of curb ramps requires no actual "design." They assert that the standards and specifications for curb ramps and slopes are detailed in the UFAS and ADAAG guidelines which are

---

**4.** We should note that the Court is aware of the heavy burden this will place on the City's limited resources. It is unfortunate that Congress, in enacting this type of legislation, often fails to provide the means of financing the obligations it imposes.

incorporated in the regulations and that the City uses a specific design for curb ramps which is pre-set. This interpretation of the term "design" is unduly restrictive. We do not construe the term "design" to mean only the drawing up of technical specifications. Street resurfacing can require significant planning by the City, including the procurement of funds and the solicitation of bids. Such advance planning and preparation amounts to "design." We conclude that the obligations imposed by 28 C.F.R. § 35.151 apply only to those contracts for which bids were let after January 26, 1992.

The plaintiffs' motion for summary judgment will be granted and the defendant will be ordered to install curb ramps or slopes on every City street, at any intersection having curbs or other barriers to access, where bids for resurfacing were let after January 26, 1992. The defendant's motion for summary judgment will be denied.

### ORDER

AND NOW, this 2nd day of February, 1993, for the reasons set forth in the accompanying Memorandum, it is hereby ORDERED that the Motion of plaintiffs for Summary Judgment is GRANTED and that the Motion of defendant, Alexander Hoskins, Commissioner of the Philadelphia Streets Department, for Summary Judgment is DENIED.

It is further ORDERED that defendant shall install curb ramps or slopes on every City street, at any intersection having curbs or other barriers to access, where bids for resurfacing were let after January 26, 1992.