Bernard SCHONFELD; Alice Schonfeld, Plaintiffs,

v.

**CITY OF CARLSBAD and Does 1 Through 10, Inclusive, Defendant.**

No. 96–0856–IEG (JFS).

United States District Court, S.D. California.

Sept. 5, 1997.

Theodore A. Pinnock, Pinnock and Kelso, San Diego, CA, for Plaintiffs.

Ronald R. Ball, City Attys. Office, Carlsbad, CA, Arlene Prater, Caryn L. Craig, Best, Best and Krieger, San Diego, CA, for Defendant.

## BACKGROUND

GONZALEZ, District Judge.

On December 23, 1996, plaintiffs filed a second amended complaint on behalf of a proposed class[1] which alleges violations of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 et. seq., the Rehabilitation Act, 29 U.S.C. § 794, and the California Unruh Civil Rights Act, Cal Civ.Code § 51 et seq.[2] Plaintiffs name the City of Carlsbad as the defendant. Plaintiffs seek damages, attorney's fees, and "such other further relief as the court deems proper."

In the complaint, plaintiffs allege that, on different dates in 1996, they were unable to access specific buildings or use the defendant's parking facilities, ramps, and streets because of the defendant's failure to comply with the ADA. Plaintiffs bring claims under the ADA and the Rehabilitation Act for: 1) denial of full and equal access to defendant's facilities and services; and 2) discrimination on the basis of their disabilities.

The parties have now filed cross-motions for summary judgment under Fed.R.Civ.P. 56.[3] Plaintiffs have also filed a motion for

---

1. Plaintiffs describe the proposed class as "persons with a wide range of disabilities, including but not limited to, persons who use ambulatory devices for mobility, who must be able to access the public programs, activities, and/or services of a municipality like the City of Carlsbad." (Complaint para. 6).

2. The Unruh Act, which bans various types of discrimination in public accommodations and provides for damages, was amended in 1992 so that effective January 1993, violations of the ADA generally also constitute violations of the Unruh Act. The degree of "full and equal access" to places of public accommodation guaranteed to disabled persons under section 54.1(a) of the California Disabled Persons Act is defined by building code standards imposed under Cal. Gov't Code § 4450 et seq. *Arnold v. United Artists Theatre Circuit, Inc.*, 158 F.R.D. 439, 446 (N.D.Cal., 1994). Cal. Health & Safety Code § 19955 et seq mandates that public accommodations or facilities constructed with private funds also adhere to the building code standards provided for by Cal. Gov't Code § 4450 et seq.

3. In conjunction with their motion for summary judgment (MSJ), plaintiffs request judicial notice of the following: 1) City of Carlsbad Manager's Administrative Order No. 58 (Plaintiffs' MSJ Exhibit D); 2) City of Carlsbad's 1992 ADA Transition Plan ("Transition Plan") (Plaintiffs' MSJ Exhibit E); 3) City of Carlsbad's November 15, 1994 Status Report ("Status Report") (Plaintiffs' MSJ Exhibit F); and 4) ADA Access Assessment for the Harding Community Center, with attached July 6, 1992 ADA Comment form (Plaintiffs' MSJ Exhibit J). As judicial notice may be taken of those facts that are capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be challenged, under Fed.R.Evid. 201(b), plaintiffs' request for judicial notice is **GRANTED**. Defendant has raised an evidentiary objection to plaintiffs' submission of a copy of the City of Carlsbad ADA Questionnaire (Plaintiffs' MSJ Exhibit G). However, because the Court has not relied on this Exhibit, defendant's evidentiary objection is **OVERRULED**.

In conjunction with their opposition to defendant's MSJ, plaintiffs also submit two "Expert Reports" of Elizabeth Bacon. ("Bacon I" and "II" Reports). Defendant objects to this evidence under Fed.R.Evid. 602 and 802 on the grounds that Bacon has not established that she has personal knowledge of the matters alleged and that the Reports contain hearsay. Fed. R.Civ.P. 56(e) provides that supporting and opposing affidavits submitted in conjunction with a motion for summary judgment shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein, Upon review of the Bacon Reports, the Court finds that Bacon has not made a sufficient showing that she has personal knowledge of the matters in the reports. Fed.R.Evid. 602. Although Bacon has demonstrated that she can be designated an "expert" on compliance with the ADA by public entities (Bacon I Report paras. 1—8), Bacon does not provide a foundation for her statements about defendant's self-evaluation, transition plan, and facilities. Bacon's knowledge appears to originate from the defendant's web page (Bacon II Report para. 12) and from publications of third parties whose subject matter is not specific to the defendant (Bacon II Report para. 38). Furthermore, Bacon's Reports contain evidence as to issues which are not raised in plaintiffs' complaint—i.e., allegations regarding defendant's communications system. (Bacon I Report para. 60). Accordingly, defendant's evidentiary objections to the Bacon Reports are **SUSTAINED**.

In conjunction with its motion for summary judgment and in opposition to plaintiffs' motion,

certification of class under Fed.R.Civ.P. 23. After reviewing the memoranda and declarations filed, the Court finds the matter suitable for disposition without oral argument. Local Rule 7.1(d)(1).

## DISCUSSION

### A. Standing and Statutes of Limitations Under the ADA

As a preliminary matter, the Court addresses the issues of standing and statute of limitations raised by the defendant in its motion for summary judgment.

### 1. "Qualified Individuals with Disabilities" Under the ADA

In order to have standing under Title II of the ADA, which requires that "reasonable modifications" be made to public services and programs that discriminate on the basis of disability, a plaintiff must show that he or she is a "qualified individual with a disability." 42 U.S.C. § 12132. The term "qualified individual with a disability" is defined as:

> an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.

42 U.S.C. § 12131(2).

■ Plaintiff Bernard Schonfeld suffers from a spinal cord injury and uses a wheelchair for mobility. Plaintiff Alice Schonfeld, who at times must use a wheelchair, suffers from a mental impairment which affects her neurological, musculoskeletal, special sense organs, and cardiovascular systems. (Complaint paras. 7, 17; Deposition of Alice Schonfeld attached as Plaintiffs' MSJ Exhibit I p. 65, 11. 13–28, p. 66, 11. 1—22). Plaintiffs allege that they have been residents of the City of Carlsbad since December 1995. (De-

defendant submits the declarations of attorneys Arlene Prater and Caryn L. Craig, Senior Management Analyst for the City Manager's Office Frank Boensch, city attorney Ronald R. Ball, Community Services Department Facilities Su-

position Transcript of Bernard Schonfeld attached as Plaintiffs' MSJ Exhibit H p. 66, 11. 4—18).

Defendant argues that plaintiffs are not "qualified individuals with disabilities" if they do not request defendant's services. Defendant explains that plaintiffs should have made formal requests to utilize the facilities and services that are the subject of the instant lawsuit before bringing suit. The Court finds this argument without merit. The ADA does not require plaintiffs bringing a claim alleging inadequate access to a facility to have "formally" requested to use the facility. As for defendant's contention that standing under the ADA requires a plaintiff show that he/she was actually excluded from participation, denied benefits, or otherwise discriminated against by the defendant on the basis of his/her disability, the Court notes that defendant is confusing the allegations and evidence required to state and prove an ADA claim with the principle of standing.

As disabled residents of the City of Carlsbad, plaintiffs meet the "essential eligibility requirements" for the receipt of services and the participation in programs and activities provided by the defendant. Thus, the Court finds that plaintiffs are "qualified individuals with disabilities" within the meaning of the ADA and have standing to bring this action. The Court further notes that there appears to be no dispute that defendant, the City of Carlsbad, as a public entity which employs 50 or more persons, owns and/or operates several facilities, and maintains numerous streets and sidewalks, is subject to the requirements of Title II of the ADA.

### 2. Statute of Limitations

Defendant also argues that plaintiffs' ADA claims are barred by California's one-year personal injury statute of limitations. Cal. Code of Civil Procedure § 340(3).

■ The ADA, like many federal civil rights statutes, does not contain a specific statute of limitations. Thus, the most appro-

perintendent Chuck Walden ("Walden I" and "II" Declarations), architect W. Stephen McCarthy ("McCarthy I" and "II" Declarations), Traffic Division Principal Civil Engineer Walter H. Brown, and City Engineer Lloyd B. Hubbs.

priate state limitations period applies. *Wilson v. Garcia,* 471 U.S. 261, 266–67, 105 S.Ct. 1938, 1941–42, 85 L.Ed.2d 254 (1985). As noted by the Seventh Circuit in *Soignier v. American Bd. of Plastic Surgery,* 92 F.3d 547, 551 (7th Cir.1996), *cert denied* —— U.S. ——, 117 S.Ct. 771, 136 L.Ed.2d 716 (1997), actions for discrimination under the ADA are best characterized as actions for "fundamental injury to the individual rights of a person." *Soignier,* 92 F.3d at 551 (citing *Goodman v. Lukens Steel Co.,* 482 U.S. 656, 661, 107 S.Ct. 2617, 2621, 96 L.Ed.2d 572 (1987)); *Wilson,* 471 U.S. at 280, 105 S.Ct. at 1949. *See also Taylor v. Regents of Univ. of Cal.,* 993 F.2d 710, 712 (9th Cir.1993), *cert denied* 510 U.S. 1076, 114 S.Ct. 890, 127 L.Ed.2d 83 (1994) (state statutes of limitations are applicable to civil rights actions under 42 U.S.C. §§ 1981, 1983, 1985, and 2000d).

■ The Court declines to accept defendant's contention that an ADA plaintiff's claims accrue on precisely the date on which a public entity's transition plan and self-evaluation are due under the ADA. Furthermore, even applying California's one-year statute of limitations for personal injury actions, plaintiffs' claims are not time-barred. Plaintiffs' claims of inadequate access and discrimination arise out of factual allegations—beginning on January 26, 1995 and continuing afterward—that they were allegedly "excluded from participation in or [were] denied the benefits of the services, programs or activities of" the defendant or were "subjected to discrimination" by the defendant. 42 U.S.C. § 12132. Plaintiffs filed their original complaint, based on the allegedly continuing ADA violations, on May 10, 1996. Thus, the Court finds that plaintiffs' suit was timely filed. *See Indep. Housing Services v. Fillmore Ctr.,* 840 F.Supp. 1328, 1346 (N.D.Cal., 1993) (maintenance of a discriminatory system before and during the limitations period is a continuing violation).

## B. The Parties' Cross–Motions for Summary Judgment

### 1. Legal Standard

Summary judgment is proper where the moving party demonstrates "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party meets its burden by showing "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). To avoid summary judgment, the nonmoving party must go beyond the pleadings and offer "specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986).

Throughout the review of a motion for summary judgment, the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Industrial Co. v. Zenith Radio,* 475 U.S. 574, 587–88, 106 S.Ct. 1348, 1356–57, 89 L.Ed.2d 538 (1986) (citing *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962)). "Finally, if the factual context makes the non-moving party's claim implausible, that party must come forward with more persuasive evidence than would otherwise be necessary to show that there is a genuine issue for trial." *California Architectural Bldg. Products, Inc. v. Franciscan Ceramics, Inc.,* 818 F.2d 1466, 1468 (9th Cir. 1987), *cert denied* 484 U.S. 1006, 108 S.Ct. 698, 98 L.Ed.2d 650 (1988).

### 2. Analysis

Plaintiffs move for summary judgment on grounds that defendant: 1) failed to have a Transition Plan by July 26, 1992 which contained a schedule for the installation of curb ramps; 2) failed to make existing facilities accessible and install curb ramps to its existing sidewalks by January 26, 1995; and 3) improperly modified existing curb ramps such that they are not in compliance with the ADA Access Guidelines for buildings (ADAAG). (Plaintiffs' MSJ p. 2, 11.9—19). Defendant moves for summary judgment on grounds that: 1) defendant formulated a detailed transition plan by July 26, 1992 which contained more improvements than required to achieve legal accessibility; 2) defendant conducted an extensive self-evaluation; 3) defendant's existing services, programs, and

facilities, when each viewed in their entirety, are currently accessible to the disabled; and 4) all of the defendant's newly altered or constructed curb ramps are ADA-compliant. Defendant further argues that plaintiffs' claims are moot because any uncompleted modifications are scheduled to be completed by December 31, 1997. (Defendant's MSJ p. 2, 11.7—24).

**The Americans with Disabilities Act of 1990**

 In 1992, Congress enacted the ADA to address the problem of discrimination against persons with disabilities. Specifically, the ADA prohibits discrimination in employment (Title I), in public services and public transportation (Title II), in public accommodations (Title III), and in telecommunications (Title IV). Title II, which is the subject of this dispute, provides:

> no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132. Title II of the ADA was expressly modeled after Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, which prohibits discrimination against disabled individuals by any program receiving public funds.[4] The ADA prohibits discriminatory effect regardless of a public entity's motive or intent. *Tyler v. City of Manhattan,* 857 F.Supp. 800, 814 (D.Kan.1994). A qualified individual with a disability may bring an action under the ADA without exhausting federal administrative remedies. *Tyler,* 857 F.Supp. at 812.

For ADA claims alleging discrimination on the basis of disability, the plaintiff carries the burden of proof. *Id.;* 42 U.S.C. § 12132. To prove that a public program or service violates Title II, a plaintiff must show: (1)

he/she is a "qualified individual with a disability"; (2) he/she was either excluded from participation in or denied the benefits of a public entity's services, programs or activities, or was otherwise discriminated against by the public entity; and (3) such exclusion, denial of benefits, or discrimination was by reason of his/her disability. 42 U.S.C. § 12132; *Weinreich v. Los Angeles County Metropolitan Transportation Authority,* 114 F.3d 976, 978 (9th Cir.1997). Similarly, under Section 504 of the Rehabilitation Act, a plaintiff must show: (1) he/she is an "individual with a disability"; (2) he/she is "otherwise qualified" to receive the benefit; (3) he/she was denied the benefits of the program solely by reason of his disability; and (4) the program receives federal financial assistance. 29 U.S.C. § 794; *Bonner v. Lewis,* 857 F.2d 559, 562–63 (9th Cir.1988).

 The ADA directs the United States Attorney General to promulgate regulations to implement Title II of the ADA. These regulations are codified in Title 28, Chapter 35 of the Code of Federal Regulations ("ADA Regulations"). There is a private right of action for enforcement of these regulations to require public entities to implement nondiscriminatory standards and proceed to make necessary modifications. *Miller v. City of Johnson City, Tennessee,* 1996 WL 406679 at *2 (E.D.Tenn., 1996).

**a. The ADA Requires that a Public Entity Evaluate its Current Services, Policies and Practices as well as Develop and Adopt a Comprehensive Transition Plan.**

**(1) Self-Evaluation**

The "ADA Regulations" require a public entity to "evaluate its current services, policies and practices, and the effects thereof." [5]

---

4. 29 U.S.C. § 794 provides:

 No otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance ...

 29 U.S.C. § 794.

5. The ADA self-evaluation requirement imposes an affirmative duty on public entities to conduct the evaluation in conjunction with input from interested persons for the purpose of identifying problems and proceeding to correct them. The public entity must maintain for public inspection a list of interested persons consulted in the self-evaluation process, a description of areas examined and the problems identified in the self-

A self-evaluation is to be conducted within one year of the effective date of the regulations. The ADA regulations became effective on July 26, 1991. *See* 28 C.F.R. § 35.105(a); *see also* 42 U.S.C. § 12134(a). Therefore, defendant should have completed its self-evaluation no later than July 26, 1992.

Plaintiffs allege that defendant "failed to conduct a lawful self-evaluation." (Complaint para. 15). However, defendant provides evidence that it conducted a self-evaluation, through its ADA Task Force, which identified existing facilities where services and programs are offered, the improvements required for ADA compliance, the estimated cost of the improvements, and the schedule for completion in terms of fiscal years. Defendant's ADA Task Force received input from City Departments and other interested parties, conducted Access Assessments for each publicly used site, prepared checklists for facility inspection, and compiled information for the development of defendant's Transition Plan. (Defendant's MSJ Exhibits 1—5; Boensch Declaration paras. 5—6; Walden I Declaration paras. 5 –6). In June 1992, defendant's Department Heads conducted 25 facility-by-facility ADA evaluations which were compiled by the City Manager in a Self–Evaluation Summary. (Defendant's MSJ Exhibits 1, 7—8; Boensch Declaration paras. 5, 9; Walden I Declaration paras. 5, 9). The Self–Evaluation Summary incorporates information on: the availability of telephone devices and other assistive listening devices for the deaf, electronic print magnifiers, close-captioned videos, large type books, talking books, staff assistance for disabled persons seeking to fill out various applications and read City documents, sign language assistance in defendant's recreational areas, employment practices, police assistance for the disabled, and procedures to evacuate disabled individuals during an emergency. (Defendant's MSJ Exhibit 8).

On the basis of the evidence presented by the parties, the Court finds that plaintiffs have failed to come forward with persuasive evidence to show there is a genuine issue for trial in support of their claim that defendant's self-evaluation failed to comply with ADA Regulations. Furthermore, the Court finds that defendant has presented persuasive evidence that it conducted the self-evaluation in a timely fashion, solicited input from a variety of sources, identified the facilities, programs and services it offers, and assessed the improvements required for ADA compliance.

Accordingly, the Court **GRANTS** summary judgment to the defendant and **DENIES** summary judgment to the plaintiffs on plaintiffs' ADA claim that defendant's self-evaluation was not in compliance with ADA Regulations.

### (2) Transition Plan

Public entities employing at least 50 persons must adopt a transition plan by July 26, 1992, if structural changes are undertaken to achieve program accessibility. *See* 28 C.F.R. § 35.150(d)(1). The transition plan shall, at a minimum:

(i) Identify physical obstacles in the public entity's facilities that limit the accessibility of its programs or activities to individuals with disabilities;

(ii) Describe in detail the methods that will be used to make the facilities accessible;

(iii) Specify the schedule for taking the steps necessary to achieve compliance with this section and, if the time period of the transition plan is longer than one year, identify steps that will be taken during each year of the transition period; and

(iv) Indicate the official responsible for implementation of the plan.

28 C.F.R. § 35.150(d)(3).

There is no dispute that defendant developed a Transition Plan which was formally adopted by the City Council on July 28, 1992. (Defendant's MSJ Exhibit 6; Boensch Declaration para. 7; Walden I Declaration para. 7). The Transition Plan identified improve-

---

evaluation, and a description of any modifications needed. 28 C.F.R. § 35.105(c). In *Tyler, supra,* the district court found that the purpose of the self evaluation is "to identify factors associated with a public entity's current services, poli-cies, and practices that pose barriers, whether structural or non-structural, to participation by persons with disabilities." *Tyler,* 857 F.Supp. at 815.

ments in each of the defendant's publicly used facilities, detailed the methods for improving accessibility, included a per facility cost estimate and scheduled completion date, established a formal grievance policy, and designated the City Manager as the official responsible for the Plan's implementation. (Defendant's MSJ Exhibit 6, Boensch Declaration para. 7).

However, 28 C.F.R. § 35.150(d)(2) sets forth additional requirements for transition plans created by public entities with "responsibility or authority over streets, roads, or walkways." Such plans "shall include a schedule for providing curb ramps or other sloped areas where pedestrians walks cross curbs, giving priority to walkways serving entities covered by the Act ..." 28 C.F.R. § 35.150(d)(2); *Kinney v. Yerusalim*, 9 F.3d 1067, 1071–72 (3d Cir.1993), *cert. denied sub nom., Hoskins v. Kinney*, 511 U.S. 1033, 114 S.Ct. 1545, 128 L.Ed.2d 196 (1994) (Title II regulations give specific priority to installation of curb cuts).

Plaintiffs allege that the defendant's 1992 Transition Plan and 1994 Status Report failed to include a schedule for installing curb ramps and do not identify the time by which the installation of curb ramps is to be completed. However, defendant provides evidence that curb ramps are included in a separate Pedestrian Ramp Inventory which is the outgrowth of defendant's ongoing examination of the public right-of-way. (Boensch Declaration para. 8; Walden I Declaration para. 8; Defendant's Opposition Exhibits 7—10; Hubbs Declaration paras. 7—12).

In 1988, defendant adopted a Pedestrian Action Plan which expanded defendant's emphasis on pedestrian circulation, requested regional pedestrian finding, and developed an education program. (Hubbs Declaration para. 6). In 1991, defendant prepared a Sidewalk Inventory Report which identified streets lacking sidewalks and developed a priority system to begin sidewalk installation over five years with a budget allocation of $300,000 per year.[6] (Hubbs Declaration par-

as. 7—9; Defendant's Opposition Exhibit 5). In 1995, defendant initiated a study focused on pedestrian ramps which included an index listing every public street in the City and a comprehensive inventory of all existing and missing ramps located within the public right-of-way. (Hubbs para. 11; Defendant's Opposition Exhibit 7). In defendant's Pedestrian Ramp Inventory, published in January 1996, nearly 900 locations were identified for either new ramp installation or existing ramp alterations at an estimated cost of $1 million. (Hubbs Declaration para. 11; Defendant's Opposition Exhibit 7).

Furthermore, defendant has provided evidence that it has established a time-frame and set aside a budget for installation of the curb ramps identified in its Pedestrian Ramp Inventory over the next four fiscal years. (Defendant's MSJ Exhibits 18—19; Defendant's Opposition Exhibit 11). Thus, although defendant's 1992 Transition Plan does not include a schedule for installation of the curb ramps, defendant has come forward with persuasive evidence that a time frame for installation of curb ramps has been in place since 1995 and that funding is available for its implementation. On the contrary, plaintiffs have failed to come forward with evidence demonstrating a genuine issue for trial in support of their claim that defendant does not have a curb ramp schedule in place.

Accordingly, the Court **GRANTS** summary judgment to the defendant and **DENIES** summary judgment to the plaintiffs on plaintiffs' ADA claim that defendant has failed to establish a curb ramp schedule.

**b. The ADA Requires that Existing Facilities, When Each Viewed in their Entirety, Should be Made Accessible to Individuals with Disabilities.**

Pursuant to 28 C.F.R. § 35.150(a)(1), a public entity need not necessarily make each of its existing facilities accessible However, each of the entity's services, programs, and activities must be operated so that, when viewed in its entirety, it is "readily accessible

---

6. Priority for sidewalk construction was given to those areas that provide direct access to schools, institutional uses, commercial zones, and areas known to have hazard potential. (Hubbs Declaration para. 8).

to and usable by individuals with disabilities" by January 26, 1995. 28 C.F.R. § 35.150(a). This mandate may be met by a variety of means, which may not necessarily include structural changes in existing facilities.[7] *See* 28 C.F.R. § 35.150(b)(1); *see also Kinney v. Yerusalim,* 812 F.Supp. 547, 548–49 (E.D.Pa. 1993); *aff'd,* 9 F.3d 1067 (3d Cir.1993), *cert. denied sub nom., Hoskins v. Kinney,* 511 U.S. 1033, 114 S.Ct. 1545, 128 L.Ed.2d 196 (1994). Where structural changes in facilities are undertaken to achieve accessibility, such changes are required to have been made within three years of January 26, 1992, "but in any event as expeditiously as possible." 28 C.F.R. § 35.150(c). Streets are considered existing facilities under the regulations and, as such, curb ramps at existing sidewalks are subject to the general requirements for program accessibility. 28 C.F.R. § 35.150(d)(2).

**(1) Existing Facilities**

■ Plaintiffs provide the following evidence, in the form of declarations, in support of their claim that they have been denied full and equal access to and/or have been discriminated against with respect to their utilization of defendant's existing facilities:

1) *City Hall Complex:* On February 8, 1996, plaintiffs had difficulty utilizing the services within defendant's City Hall because disabled parking was not wide enough for a van, there was no signage indicating the location of the City Council Chambers and where the disabled parking is located, one of the back doors is too heavy for a member of the disabled community to open it independently, and the entrance does not have a ramp (Plaintiffs' MSJ Exhibit I p. 48, 1.21—p. 50, 1. 7; p. 60, 11. 22—27; p. 63, 11. 1—22; p. 66, 11. 23—28);

2) *Public Library:* On an unspecified date, plaintiffs were unable to use the drinking fountain and access the elevator cab. The Public Library also lacks curb ramps (Plaintiffs' MSJ Exhibit H p. 20, 11. 5—16 and Exhibit I p. 53, 11. 1—6; p. 53, 1.8, 11. 11—15; p. 54, 11. 21—26; Plaintiffs' Opposition Exhibit L p. 20, 11. 5—16);

3) *Safety Center:* On an unspecified date, plaintiffs were unable to locate disabled parking and had difficulty entering (Plaintiffs' Exhibit MSJ I p. 45, 11. 14—24, pp. 46—48, 1. 20; p. 69, 11. 10—24);

4) *Post Office and Downtown School:* On an unspecified date, plaintiffs accessed these facilities with great difficulty due to a lack of curb ramps (Plaintiffs' MSJ Exhibit H p. 21, 11. 21—28 and Exhibit I p. 53, 11. 17—26; p. 54, 11. 1—6, p. 58, 1. 25—p. 59, 1.11); and

5) *Main Bus Stop and Retirement Complex:* On an unspecified date, plaintiffs had great difficulty accessing these facilities due to a lack of curb ramps (Plaintiffs' MSJ Exhibit H p. 22, 11. 10—11, 11. 26—28 and Exhibit I p. 53, 11. 25—27).

The ADA requires that existing services and facilities, *when viewed in their entirety,* be made accessible by a variety of means *which need not necessarily include structural changes.* 28 C.F.R. § 35.150 (emphasis added). The Court notes that defendant's 1994 Status Report is substantially identical to the 1992 Transition Plan, with the exception that the Status Report sets later scheduled completion dates for the majority of improvements first listed in the Transition Plan and also adds new facilities to the Plan. (Plaintiffs' MSJ Exhibit F). However, defendant provides evidence that: 1) the challenged facilities are currently accessible, when each is viewed in its entirety; 2) it has already made a number of significant improvements to its facilities; and 3) a majority of improvements will be completed by December 31, 1997.[8] (Defendant's MSJ Exhibit

---

7. For example, a public entity may comply with the accessibility re requirement by relocating services to accessible buildings, constructing new facilities, or delivering services by assigning aides to program beneficiaries. The ADA Regulations expressly provide that an entity need not make structural changes to existing facilities "where other methods are effective in achieving compliance." 28 C.F.R. § 35.150(b)(1).

8. Defendant demonstrates that on August 1, 1996, it issued a Request for Proposals for ADA Improvements which would encompass time and cost estimates as well as construction plans for specific alterations at various City facilities. An agreement was entered into between defendant and Moon Mayoras Architects, Inc. on September 18, 1996 to complete the work. The work was completed by February 1997. (Defendant's

17; Boensch Declaration paras. 12—14; Walden I Declaration paras. 11—12; McCarthy I Declaration paras. 17—21).

Defendant provides the following evidence with respect to the specific facilities which plaintiffs allege do not provide full and equal access:

1) *City Hall Complex:* The City Hall has had disabled parking since 1986—87, located in the upper lot closest to the entrance. There has been signage in the lower lot directing traffic to the upper lot disabled parking since the mid–1980's. In early February 1996, the parking spaces were reconfigured to facilitate the addition of: a) two more disabled parking spaces for a total of four—including one space sized and including signage for van accessibility; and b) two new ramps for a total of four. (Defendant's MSJ Exhibits 25—27; Walden I Declaration paras. 15A; McCarthy I Declaration para. 18A). Defendant admits that, in one men's restroom, a partition installed for greater privacy may minimally affect 5–foot wheelchair turning radius. However, defendant provides evidence that there are two ADA-compliant restrooms near the City Council chambers and that the non-compliant restroom is scheduled for corrective work before December 31, 1997. Defendant also provides evidence that the non-compliant men's restroom has been used by members of the disabled community. (Walden I Declaration para. 15B; McCarthy I Declaration para. 18C). Defendant is also currently trying to resolve the problem of the rear door closures—which are currently set at 10 pounds,

rather than the 8½ pounds required by the ADA Access Guidelines. Doors to the City Council chambers comply with the ADA. (Walden I Declaration para. 15C; McCarthy I Declaration para. 18B).

2) *Public Library:* The Main Library underwent extensive ADA remodeling in June 1995 (Defendant's MSJ Exhibits 9—11; Boensch Declaration para. 10; Walden I Declaration para. 16A). The remodeled areas and path of travel are ADA compliant. Defendant provides evidence that the library is scheduled for another total remodel within three to five years which will include an elevator modification. Staff is available to retrieve books from the second floor for any library patron who needs such assistance. (Walden I Declaration para. 16E; McCarthy I Declaration para. 19D). The library has six disabled parking spaces which comply with the ADAAG in dimensions and signage. The path of travel from the parking lot to the primary entrance is level. (Walden I Declaration para. 16B; McCarthy I Declaration para. 19A). Though the drinking fountain was installed with the manufacturer's representation that it was ADA-compliant, the fountain's spout location and flow of water are not technically in compliance. (Defendant's MSJ Exhibits 28—29; Walden I Declaration para. 16C; McCarthy I Declaration para. 1OB). The library's restrooms were remodeled in fight of the ADA's requirements and are readily accessible with signage, although the men's restroom clearances are not technically correct due to existing physical restraints at the library's current location.[9] (Defen-

MSJ Exhibits 21—22; Walden I Declaration para. 11A). On June 17, 1997, defendant's City Council extended and amended the agreement with Moon Mayoras to provide for additional work. In accordance with the state Public Contracts Code, defendant will be required to obtain outside bidding for the work. Defendant expects that a substantial portion of this additional contract will be completed by December 31, 1997 at a cost of almost $300,000 for architectural services and construction. The City Council has appropriated $240,000 for this work for fiscal year 1997—1998. (Defendant's MSJ Exhibit 24, Walden I Declaration para. 11B).

Defendant also demonstrates that it chose not to make ADA improvements to three facilities,

one of which it is trying to divest itself of, one of which is not used by the public, and one of which is leased property for which defendant is attempting to locate an alternative site. (Walden I Declaration para. 11C).

Finally, defendant provides evidence that: 1) in 1996, it completed improvements in 10 City parks designed to improve access for disabled individuals; and 2) three other parks are scheduled for improvements within the next three fiscal years. (Defendant's MSJ Exhibits 12—17).

9. The ADAAG provides that alteration work shall provide accessibility "to the maximum extent feasible" where strict compliance is technically infeasible. ADAAG § 4.1.6(j). "Technically in-

dant's MSJ Exhibits 28, 30; Walden I Declaration para. 16D; McCarthy I Declaration para. 19C). Defendant provides evidence that to relocate the men's restroom and the elevator before the next scheduled library remodel would be "impractical and cost prohibitive."[10] (Walden I Declaration para. 16E; McCarthy I Declaration para 19D).

3) *Safety Center:* Since 1986, the Center has had at least two disabled parking spaces and there have been six spaces since late 1996. Existing parking is compliant in number, dimension, and signage; the path of travel to the primary entrance is level; and parking is located as close as possible to the Center's entrance. (Defendant's MSJ Exhibits 31—33; Walden I Declaration para. 17; McCarthy I Declaration para. 20).

4) *Post Office and School at Harding and Chestnut:* There are two disabled parking spaces immediately in front of the post office and curb ramps on the corners of the intersection immediately south. (Brown Declaration para. 5G; McCarthy Declaration paras. 11, 17). There are curb ramps on three corners at the school. (Walden II Declaration para. 7).

5) *Retirement Complex Area:* Most streets lack sidewalks and do not require curb cuts. (Walden II Declaration para. 6; McCarthy II Declaration para. 17B; Brown Declaration para. 8).

The Court finds that plaintiffs have failed to come forward with persuasive evidence to show there is a genuine issue for trial in support of their claim that specifically challenged facilities, when each is viewed in its entirety, discriminate against or provide inadequate access for individuals with disabilities. Plaintiffs have failed to demonstrate that they were discriminated against or denied the benefits of the services offered by defendant at the City Hall, Library, Post Office, Safety Center, Downtown School, Main Bus Stop, or Retirement Complex on account of any of the structural "barriers" they identified. Furthermore, plaintiffs' evidence demonstrating that alterations were made by the defendant to its facilities after January 26, 1995, do not raise a material issue of triable fact that there is an existing controversy between the parties. (Plaintiffs' Opposition Exhibits E and G). On the contrary, defendant has provided evidence sufficient to demonstrate that no material issue of triable fact exists and that the challenged facilities, when each is viewed in its entirety, do not discriminate against or deny plaintiffs access to the facilities on the basis of plaintiffs' disabilities.

Accordingly, the Court **GRANTS** summary judgment to the defendant and **DENIES** summary judgment to the plaintiffs on plaintiffs' ADA and Rehabilitation Act claims of denial of access and discrimination with respect to the challenged facilities.

**(2) Curb Ramps**

██ Pursuant to 28 C.F.R. § 35.150(d)(2), public entities must give priority to installing curb ramps where pedestrian walks cross curbs, giving priority to walkways serving entities covered by the ADA—including government offices and facilities, transportation, places of public accommodation and employment, followed by walkways serving other areas.[11]

---

feasible" is defined as an alteration which has little likelihood of being accomplished "because existing structural conditions would require removing or altering a load-bearing member which is an essential part of the structural frame; or because other existing physical or site constraints prohibit modification or addition of elements ..." ADAAG § 4.1.6(j).

**10.** 28 C.F.R. § 35.150(a)(3) provides for an undue burden defense which states that a public entity is not required "to take any action that it can demonstrate would result in a fundamental alteration in the nature of a service, program, or activity or in undue financial and administrative

burdens. A public entity has the burden of proof for this defense. The decision that compliance would result in such an undue burden must be made by the head of the public entity or his/her designee and must be accompanied by a written statement of the reasons for reaching that conclusion." 28 C.F.R. § 35.150(a)(3).

**11.** However, public entities are not required to construct a curb ramp at every intersection. Alternative routes to buildings that make use of existing curb ramps may be acceptable under the concept of program accessibility in limited circumstances where disabled individuals need only travel a marginally longer route. In addition,

Plaintiffs allege that, "during different times in 1996," they were not able to use defendant's parking facilities and streets because specific streets do not have curb ramps.[12] (Complaint para. 8; Plaintiffs' Exhibit I p. 52, ll. 9—12, 1.28, p. 54, ll. 10—13). Plaintiffs identify several intersections from which curb ramps are missing, but do not provide evidence that the missing curb ramps denied them access to defendant's parking facilities and streets. (Declaration of Royce Hamrick p. 3, 1.13—p. 4, 1. 6).[13]

Defendant offers evidence that, on December 1, 1994, defendant's City Manager issued Administrative Order No. 58 which established a procedure for responding to requests for ramp construction. (Defendant's Opposition Exhibit 6). Defendant has received one request for curb ramp construction to date and promptly made the requested change. (Brown Declaration para. 11). More importantly, defendant established a Pedestrian Ramp Inventory in 1995—1996 which includes curb ramps (Defendant's Opposition Exhibit 7). Defendant's City Engineer is responsible for establishing and maintaining the inventory as well as processing construction requests. Over $1 million has been spent by defendant to date on sidewalk construction, including curb ramps, with priorities given for access routes to schools, government facilities, commercial zones, public transportation, and areas known to have hazard potential.[14] (Hubbs Declaration paras. 8—9, 12; McCarthy II Declaration para. 17A; Defendant's Opposition Exhibits 8—9). Another $500,000 in ramp funding is ready to go to bid and another $500,000 is in the design stage. (Hubbs Declaration para. 8).

In June 1997, the City Council increased the curb ramp program budget to $250,000 for fiscal year 1997—1998 as well as for the next three fiscal years. (Defendant's MSJ Exhibits 18—19; Boensch Declaration para. 16; Walden I Declaration para. 18; Defendant's Opposition Exhibit 11; Hubbs Declaration paras. 19—20; Brown Declaration para. 14). At present, defendant is requesting bid proposals to construct pedestrian ramps at six locations. (Hubbs Declaration para. 18; Brown Declaration para. 13; Defendant's Opposition Exhibit 12).

With respect to the specific intersections challenged by plaintiffs, defendant offers evidence that driveways which allow reasonable access and/or curb ramps will be installed at the following intersections: Pio Pico Drive and Tamarack Avenue; Pio Pico Drive and Laguna Drive; Pio Pico Drive and Oak Street; Beech Avenue and State Street; Roosevelt Street and Beech Avenue; Pio Pico Drive and Palm Avenue; Hope Avenue and Grand Avenue; and Pine Avenue and Garfield Avenue. (Brown Declaration paras. 5A—K, 7—10, 15; Hubbs Declaration paras. 11—25; McCarthy II Declaration para. 17C). Furthermore, defendant provides evidence that the duration of its four-year schedule for construction of curb ramps is necessitated by the limited availability of trained staff, hiring of outside consultants, utility conflicts (i.e., gas, electricity, water), collateral construction requirements/conflicts (i.e., storm pipes, drainage), right-of-way negotiations, and the City's formal bidding process. (Hubbs Declaration paras. 19—24).

---

the fundamental alteration and undue burdens limitations may limit the number of curb ramps required. To achieve or maintain program accessibility, it may be appropriate to establish an ongoing procedure for installing curb ramps upon request in areas frequented by individuals with disabilities as residents, employees, or visitors. (*See* ADA Technical Assistance Manual II–5.3000).

12. ADAAG § 4.7.1 provides that curb ramps complying with section 4.7 shall be provided wherever an accessible route crosses a curb.

13. Defendant objects to Hamrick's identification of intersections where curb ramps are missing

and of new curb ramps which do not comply with the ADAAG. (Hamrick Declaration p. 3, 1. 13—p. 5, 1.2). However, the Court finds that Hamrick has established that she has personal knowledge of the challenged intersections and curb ramps. (*See* Hamrick Declaration paras. 1—5; Fed.R.Evid. 602). Thus, defendant's objection to this evidence is **OVERRULED**.

14. For example, defendant demonstrates that approximately 80% of all pedestrian ramps within the Central Business District have been completed and that missing ramps are located generally on the district's boundaries. (Hubbs Declaration paras. 10, 12; McCarthy Declaration II para. 17A; Defendant's Opposition Exhibits 9—10).

The Court finds that plaintiffs' identification that curb ramps are missing from certain intersections, without more, does not raise a material issue of triable fact demonstrating that plaintiffs were discriminated against or denied the benefits of defendant's parking facilities and streets as a result of the missing curb ramps. On the contrary, defendant has offered evidence that no material issue of triable fact exists on this issue— defendant has constructed curb ramps where necessary to · provide access along highly-trafficked routes, has allocated funding and established a schedule for future curb ramp construction, and is addressing the particular intersections identified by plaintiffs as well as other intersections in accordance with ADA priorities. Accordingly, the Court **GRANTS** summary judgment to the defendant and **DENIES** summary judgment to the plaintiffs on plaintiffs' ADA and Rehabilitation Act claims that the lack of curb ramps on existing thoroughfares denies full and equal access to and/or discriminates against plaintiffs on the basis of their disabilities.

### c. The ADA Requires that New Construction be Accessible.

28 C.F.R. § 35.151(a),(b) mandates that each facility or part of a facility for which construction or alteration was commenced after January 26, 1992, shall be designed, constructed or altered "to the maximum extent feasible" in such manner that the facility or part of the facility "is readily accessible to and usable by individuals with disabilities." 28 C.F.R. § 35.15 1(a), (b). Alteration and construction is to be in conformance with the Uniform Federal Accessibility Standards (41 C.F.R. § 10 I–19.6, Appendix A) or with the ADAAG.[15] 28 C.F.R. § 35.151(c). ADA Regulations also require the installation of curb ramps at intersections for newly constructed or altered streets, roads, highways, or pedestrian walkways. 28 C.F.R. § 35.151(e)(1).

Plaintiffs allege that defendant installed curb ramps after January 26, 1992 which failed to meet the ADAAG requirements for curb ramps, ADAAG § 4.7, in the following respects:

1) the curbs have linear slopes greater than 8.33% and in some cases, as much as 17—18%;

2) there is less than 48 inches level area extension beyond the slope and in many cases, no extension at all;

3) the curbs' lips are not beveled and/or are greater than ½ inch high;

4) the curbs have side slopes greater than 12½%; and

5) the crown of the street or gutter extension at the curb is cut greater than 5%.

(Hamrick Declaration p. 4, 1.7—p. 5, 1.2; Plaintiffs' MSJ Exhibit H p. 24, 11. 10—23). However, plaintiffs have failed to identify any specific locations in which alteration or installation of curb ramps begun after January 26, 1992 has resulted in non-ADA-compliant ramps. On the contrary, defendant has offered evidence that curb ramps installed after January 26, 1992 meet ADAAG standards, taking into account site infeasibility considerations. (Brown Declaration paras. 5—6; McCarthy II Declaration para. 15; Hubbs Declaration para. 6; Defendant's Opposition Exhibits 3, 13).

The Court finds that plaintiffs have failed to raise a material issue of triable fact demonstrating that defendant's newly installed curb ramps do not comply with the ADA and its Access Guidelines. On the contrary, defendant has demonstrated that no material

---

**15.** ADAAG § 14.2 provides the minimum requirements for accessibility alterations in existing public rights-of-way. However, ADAAG § 14.3 states that alterations to individual elements shall comply "to the maximum extent feasible," if site infeasibility precludes compliance with 14.2. Any elements or features of the public pedestrian right-of-way that are being altered and can be made accessible must be made accessible. ADAAG § 14.3.1(4). (*See* Defendant's Opposition Exhibit 3; McCarthy II Declaration para. 13).

"Site infeasibility" is defined by the ADAAG as "[e]xisting site development conditions that prohibit the incorporation of elements, spaces, and features which are in full and strict compliance with the minimum requirements for new construction in the public right-of-way and which are necessary for pedestrian access, circulation, and use." ADAAG § 14.3.1(4). ADAAG technical provisions include a number of alternatives for curb ramp types, width, landings, slope and surface, where site infeasibility may prevent strict compliance. ADAAG § 14.3.2(2)(a)—(e).

issue of triable fact exists on this claim and that the claim should be decided in its favor. Accordingly, the Court **GRANTS** summary judgment to the defendant and **DENIES** summary judgment to the plaintiffs on plaintiffs' claim that defendant's new curb ramp construction is not in compliance with the ADA.

## C. Plaintiffs' Pendent State Law Claim

The Court declines to exercise supplemental jurisdiction, under 28 U.S.C. § 1367(c)(3), over plaintiffs' Unruh Act claim because the Court has granted summary judgment to the defendant on the federal claims originally joined with the state law claim. Accordingly, defendant's motion for summary judgment on plaintiffs' state law claim is **GRANTED.**

## D. Plaintiffs' Motion for Class Certification

Plaintiffs have filed a motion for class certification under Fed.R.Civ.P. 23(b)(2). However, because the Court has granted summary judgment to the defendant, the Court **DENIES** plaintiffs' motion for class certification **as moot.**

## E. Conclusion

For the reasons stated above, the Court **DENIES** summary judgment to the plaintiffs and **GRANTS** summary judgment to the defendant on all of plaintiffs' claims. Because plaintiffs have failed to raise a triable issue of material fact in support of their ADA and Rehabilitation Act claims, the Court **DENIES** plaintiffs' motion for a mandatory injunction. Finally, the Court **DENIES** plaintiffs' motion for class certification **AS MOOT.**

 **IT IS SO ORDERED.**