Nadja Linette PANZARDI–SANTIAGO
et al Plaintiffs

v.

**UNIVERSITY OF PUERTO
RICO et al Defendants**

No. CIV. 95–2316(CCC/ADC).

United States District Court,
D. Puerto Rico.

March 19, 2002.

Fernando Gallardo, Woods & Woods, San Juan, PR, for plaintiff.

Julio Nigaglioni–Arrache, Cancio, Nadal, Rivera, Díaz, San Juan, PR, Federal Litigation Division, Puerto Rico Department of Justice, San Juan, PR, for defendant.

## OPINION AND ORDER

DELGADO–COLON, United States Magistrate Judge.

Pursuant to 28 U.S.C. § 636(c) the parties have consented to final entry of judgment by a United States Magistrate Judge. *See also Local Rule 505(3).* An Order of Reference was entered on March 1, 1999 (Docket No. 82). The parties have filed numerous motions raising a variety of issues, all of which will be addressed by the Court.

### I. Procedural Background.

Plaintiffs filed suit on October 26, 1995 against the University of Puerto Rico Mayaguez campus, AB Insurance Co., the Commonwealth of Puerto Rico, BC Insurance Company, John Doe and Richard Roe (Docket No. 1). Plaintiff, Nadja Linette Panzardi–Santiago; her parents, Santiago

Panzardi–Alvarez and Ana Hilda Santiago–Figueroa; and her sisters, Yilda Panzardi–Santiago and Gisela Panzardi–Santiago alleged the defendants violated Title II of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12132[1], *et seq.* (ADA) and Article 1802 of the Civil Code of Puerto Rico.[2] Plaintiffs demand a trial by jury. To date, AB Insurance Co., BC Insurance Company, John Doe and Richard Roe[3] have not been served.

The University of Puerto Rico and the Commonwealth of Puerto Rico answered the complaint on April 15, and 22, 1996, respectively (Docket Nos. 13, 14). Plaintiffs then filed an amended complaint which eliminated the University of Puerto Rico Mayaguez campus as a party defendant. The amended complaint also added a claim that the defendants violated Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794,[4] *et seq.* (Rehabilitation Act). The University of Puerto Rico ("UPR") and the Commonwealth of Puerto Rico ("Commonwealth") answered the amended complaint (Docket Nos. 32, 33). Thereafter, the UPR and the Commonwealth moved to dismiss the claim premised upon Article 1802 of the Civil Code of Puerto Rico (Docket Nos. 66, 86). After the Court granted the Commonwealth's motion, plaintiffs agreed to voluntarily dismiss their Article 1802 claim against the UPR (Docket Nos. 72, 94). However, plaintiff Nadja Linette Panzardi–Santiago ("Panzardi") currently seeks to reinstate the Article 1802 claim (Docket No. 96). The remaining plaintiffs do not seek reinstatement as they concede that their claims are barred by the limitation period. *See* Docket No. 96, p. 5.

Panzardi seeks injunctive relief ordering the UPR and the Commonwealth of Puerto Rico to cause changes to the facilities at the UPR–Mayaguez (RUM) campus making them readily accessible and usable by qualified individuals with disabilities. Panzardi also seeks monetary damages of $500,000 under Title II of the ADA and the Rehabilitation Act, as well as compensatory damages of $400,000 under the Rehabilitation Act. As to the negligence claim brought pursuant to Article 1802 of the Civil Code of Puerto Rico, Panzardi seeks damages of $2,000,000.

The motions and responses filed with the Court raise the following issues:

1. Whether the defendants' sovereign immunity through the Eleventh Amendment was validly abrogated in Title II of the Americans with Disabilities Act (Docket Nos. 110, 112, 113, 115, 116, 123, 125).

2. Whether Panzardi establishes a prima facie case under the ADA and the Rehabilitation Act (Docket Nos. 100, 105).

3. Whether Panzardi is entitled to compensatory damages or punitive dam-

---

1. Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

2. Article 1802 provides in pertinent part that "[a] person who by an act or omission causes damage to another through fault or negligence shall be obliged to repair the damage so done...." 31 P.L.R.A. § 5141.

3. The insurance companies refer to unknown insurance companies that may insure defendants University of Puerto Rico, University of Puerto Rico Mayaguez and the Commonwealth of Puerto Rico. Defendants Does refer to unknown parties that may be liable to plaintiffs.

4. The Rehabilitation Act bans entities receiving federal funds and grants from discriminating against persons with disabilities.

ages under the ADA (Docket No. 98, 100, 105).

4. Whether Panzardi has a right to a jury trial (Docket Nos. 86, 94, 96, 98, 105).

5. Whether Panzardi has raised a viable claim against the UPR under Article 1802 of the Puerto Rico Civil Code (Docket No. 86, 94, 96, 97).

On March 14, 2000, an Order was entered holding in abeyance outstanding motions pending the decision of the United States Supreme decision in *Kimel v. Florida Board of Regents* (Docket No. 119). The stay was continued on May 23, 2000, as issues raised continued to be considered by the United States Supreme Court in *University of Alabama Board of Trustees v. Garrett* (Docket No. 126). The Court now lifts the stay as decisions have been rendered in both *Board of Trustees of Univ. of Alabama v. Garrett*, 531 U.S. 356, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001) and *Kimel v. Florida Bd. of Regents*, 528 U.S. 62, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000).

Numerous issues have been raised by the parties. However, because the UPR and the Commonwealth raised the issue of Eleventh Amendment immunity, it must be determined first, inasmuch as the Eleventh Amendment deprives federal courts jurisdiction to entertain claims against the states.

## II. Facts

Plaintiff Nadja Linette Panzardi–Santiago ("Panzardi") was born on October 27, 1973, and diagnosed with multiple sclerosis in 1987 (Docket No. 100, Nadja Panzardi Dep. pp. 9, 16). She has used a wheelchair to ambulate since October 1991. *Id.* at 19. Upon graduating from high school, Panzardi was admitted for the academic year 1991–1992 to the Engineering Transfer Program of the Regional Technological College of Bayamón. which is a unit of the UPR (Docket No. 25, para. 9). Panzardi's advisors at Bayamón were aware of her physical condition (Docket No. 100, Nadja Panzardi Dep. p. 74). Panzardi planned to continue her education at the UPR Mayaguez campus, also known as "RUM." *Id.* at 21. In March of 1993, after completing two years at Bayamón, Panzardi completed and submitted a transfer application to RUM (Docket No. 25; Docket No. 105, App. B, p. 24).

She visited the RUM campus during Holy Week, which ran from April 4, 1993 (Palm Sunday) to April 11, 1993 (Easter Sunday) accompanied by her parents and a friend (Docket No. 100, Nadja Panzardi Dep. p. 32). During this period of time the campus was closed and had ceased operations temporarily. During the four-hour visit Panzardi encountered architectural barriers which impeded her mobility to ambulate about the campus. *Id.* at 30, 33. For example, Panzardi had difficulty using a bathroom, the handicap parking space was used by someone without a handicapped parking sticker, numerous campus buildings were inaccessible as there were no access ramps, the elevator was not level with the floor, tables were too high, doorways too narrow, and State Road 108 which divides the Mayaguez Civil Engineering School from the other campus facilities had no ramps or walkways. *Id.* at 33–35, 85–88.

While visiting RUM Panzardi and her family saw Dr. Norma Saldaña, Assistant Professor of Engineering, and asked her to unlock the industrial engineering building—which she did. *Id.* at 35, 77. Saldaña showed the group around the building. *Id.* at 77. They did not, however, discuss accommodations that could be provided to students with disabilities. *Id.* at 78.

After visiting RUM Panzardi determined there were barriers that impeded

her from attending school there and she decided to apply to the University of Maryland (Docket No. 105, App. B, p. 25). Panzardi did not contact the dean of student affairs or anyone else regarding the architectural barriers that she encountered at RUM (Docket No. 100, Nadja Panzardi Dep. p. 42). She applied for enrollment at the University of Maryland on April 26, 1993, by sending a confirmation of enrollment and $100 (Docket No. 100, para. 9; Ex. 13). On May 10, 1993, after enrolling at the University of Maryland, Panzardi was notified by RUM that her application for external transfer to the Civil Engineering Department was favorably recommended for the First Semester 1993–1994 and that she should contact said department prior to May 28, 1993 (Docket No. 101, Ex. 41).

In the meantime, as a result of the chance meeting between Dr. Saldaña and Panzardi, Saldaña gave her engineering students an assignment of documenting the accessibility and/or architectural barriers at RUM (Docket No. 100, Jt. Ex. 2). On May 28, 1993, Dr. Saldaña corresponded with Mr. Rufino Matos, head of the Equal Employment Opportunity Office at RUM, and provided to him copies of her students' reports. *Id.* During this same time the Registrar's Office continued to correspond with Panzardi regarding pre-registration of classes (Docket No. 101, Ex. 40, letter dated May 27, 1993). On June 2, 1993, over a month after Panzardi had submitted her enrollment to the University of Maryland, Dr. Saldaña wrote to Panzardi wishing her success, telling her that she had left a mark on the campus and advising her that Director Alejandro Ruiz–Acevedo was interested in removing the architectural barriers at the campus. Panzardi testified that she decided not to enroll at RUM based upon the barriers she encountered during her visit and the

letter she received from Saldaña (Docket No. 100, Nadja Panzardi Dep. p. 43).

According to Panzardi, based upon her opinion that she would be unable to study at RUM, she and her parents moved to Maryland so that she could study engineering at the University of Maryland (Docket No. 100, Nadja Panzardi Dep. p. 43–46, 48). Panzardi and her family returned to Puerto Rico after one year because of the harsh environmental conditions and economic pressures. *Id.* at 50. Upon her return to Puerto Rico Panzardi determined that RUM continued to be inaccessible although she did not personally visit the campus or seek enrollment. *Id.* at 54–55. Panzardi instead chose to study management at Colegio Universitario Tecnológico de Bayamón where in May 1997, she received a bachelor's degree in Material Management. *Id.* at 13. She has not considered reapplying to RUM. *Id.* at 60.

## III. Analysis

### A. Legal Standard—Summary Judgment

A motion for summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Wolf v. Gruntal & Co.,* 45 F.3d 524, 527 (1st Cir.1995); *National Amusements, Inc., v. Dedham,* 43 F.3d 731, 735 (1st Cir.1995). The First Circuit delineated the manner in which Federal Rule of Civil Procedure 56, functions:

> Once a properly documented motion has engaged the gears of Rule 56, the party to whom the motion is directed can shut down the machinery only by showing that a trialworthy issue exists. As to issues on which the summary

judgment target bears the ultimate burden of proof, she cannot rely on an absence of competent evidence, but must affirmatively point to specific facts that demonstrate the existence of an authentic dispute. Not every factual dispute is sufficient to thwart summary judgment; the contested fact must be "material" and the dispute over it must be "genuine." In this regard, "material" means that a contested fact has the potential to change the outcome of the suit under the governing law if the dispute over it is resolved favorably to the nonmovant. By like token, "genuine" means that the evidence about the fact is such that a reasonable jury could resolve the point in favor of the nonmoving party.

*McCarthy v. Northwest Airlines, Inc.*, 56 F.3d 313, 315 (1st Cir.1995) (citations and some internal punctuation marks omitted).

The Court "must view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." *Griggs–Ryan v. Smith*, 904 F.2d 112, 115 (1st Cir.1990). While carrying out that task, the Court safely can ignore "conclusory allegations, improbable inferences, and unsupported speculation." *Suárez v. Pueblo Intern., Inc.*, 229 F.3d 49, 53 (1st Cir.2000) (quoting *Medina–Muñoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir.1990)).

Once a movant has made a preliminary showing that there exists no genuine issue of material fact, and that the movant is entitled to judgment as a matter of law, the nonmovant bears the burden to show the existence of a genuine material issue. *J. Geils Band Employee Benefit Plan v. Smith Barney Shearson, Inc.*, 76 F.3d 1245, 1251 (1st Cir.1996). The non-movant cannot meet this burden by mere allegation or denial of the pleadings. Fed.

R.Civ.P. 56(e). Nor can the nonmoving party avoid summary judgment by relying on conclusory allegations, improbable inferences, unsupported speculation, or "[b]rash conjecture coupled with the earnest hope that something concrete will materialize." *J. Geils Band Employee Benefit Plan, supra*, 76 F.3d at 1251 (quoting *Dow v. United Bd. of Carpenters*, 1 F.3d 56, 58 (1st Cir.1993)). "If no genuine issue of material fact emerges from this perscrutation, then the case may be ripe for summary adjudication." *Suárez*, 229 F.3d at 53.

## B. Eleventh Amendment

Panzardi alleges that the defendants violated Section II of the ADA. Section II provides that "[s]ubject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Title II defines a "qualified individual with a disability" as "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2).

 The Commonwealth and the UPR move for summary judgment on the basis that they are shielded against Panzardi's claims for monetary damages brought pursuant to Section II of the ADA, by sovereign immunity under the Eleventh Amendment to the United States Constitution (Docket Nos. 110, 112). It must be kept in mind that the Common-

wealth is considered a state for purposes of the Eleventh Amendment. *See Metcalf & Eddy, Inc. v. Puerto Rico Aqueduct & Sewer Auth.*, 991 F.2d 935, 939 n. 3 (1st Cir.1993). Also, the First Circuit has held that the UPR is an arm of the state and is therefore entitled to Eleventh Amendment immunity in federal courts. *Pinto v. Universidad De Puerto Rico*, 895 F.2d 18 (1st Cir.1990). Defendants claim that although the ADA clearly abrogates Eleventh Amendment immunity for state governments, said action exceeded Congress' abrogation powers. Therefore, defendants contend the abrogation is unconstitutional and invalid.

Conversely, Panzardi argues that until and unless the provisions of the ADA that authorize direct suits against the states in the federal courts are repealed or otherwise declared unconstitutional by a higher hierarchical tribunal, the district court is precluded from granting the relief sought by the defendants. Panzardi also argues that the Commonwealth has a duty to defend the laws of the land and not claim their unconstitutionality inasmuch as the Commonwealth of Puerto Rico receives funding from the United States of America. In essence, Panzardi argues, both defendants are precluded from raising the unconstitutionality of the Americans with Disabilities Act. Finally, Panzardi argues that it is not the obligation of a private party to defend the constitutional challenge of the ADA. Rather, that obligation is left to the United States Attorney to defend the constitutionality of the laws enacted by the United States Congress.[5]

Two theories have been raised by the parties regarding the sovereign immunity of the defendants. First, defendants contend that Congress did not validly abrogate their Eleventh Amendment immunity. Second, Panzardi responds that because the Commonwealth has accepted federal funds and assistance, the defendants have waived their Eleventh Amendment immunity.

### 1. Waiver of Immunity

 We turn first to the issue of waiver of immunity. Panzardi argues that the defendants are precluded from asserting Eleventh Amendment immunity because the Commonwealth receives federal funds and assistance from the United States of America. Without articulating it, Panzardi in effect argues that the defendants have waived their sovereign immunity. A state may waive its Eleventh Amendment immunity in one of two ways. It may voluntarily invoke the jurisdiction of a federal court or make a "clear declaration that it intends to submit itself to [a federal court's] jurisdiction." *See College Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 675, 119 S.Ct. 2219, 144 L.Ed.2d 605 (1999) (internal quotation marks and citation omitted). There can be no implied waiver of immunity as it must be unequivocally expressed. *College Sav. Bank*, 527 U.S. at 682, 119 S.Ct. 2219. Yet, "Congress may, in the exercise of its spending power, condition its grant of funds to the States upon their taking certain actions that Congress could not require them to take, and that acceptance of the funds entails an agreement to the actions." *College Sav. Bank*, 527 U.S. at 686, 119 S.Ct. 2219 (*citing South Dakota v. Dole*, 483 U.S. 203, 107 S.Ct. 2793, 97 L.Ed.2d 171 (1987)). The Supreme Court has acknowledged that "in

---

**5.** The Attorney General for the United States was notified of the constitutional challenge on February 28, 2001, and given an opportunity to intervene on the question of the constitu-tionality of Title II of the ADA (Docket No. 131). To date the Attorney General has not intervened.

cases involving conditions attached to federal funding "the financial inducement offered by Congress' might be so coercive as to pass the point at which 'pressure turns into compulsion.'" *College Sav. Bank,* 527 U.S. at 687, 119 S.Ct. 2219 (*citing South Dakota v. Dole,* 483 U.S. at 211, 107 S.Ct. 2793).

█ There is nothing in the ADA which "manifest[s] a clear intent to condition participation in the programs funded under the Act on a State's consent to waive its constitutional immunity." *Atascadero State Hosp. v. Scanlon,* 473 U.S. 234, 247, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985). "If Congress is not unmistakably clear and unequivocal in its intent to condition a gift or gratuity on a State's waiver of its sovereign immunity, we cannot presume that a State, by accepting Congress' proffer, knowingly and voluntarily assented to such a condition." *College Savings Bank,* 527 U.S. at 681–82, 119 S.Ct. 2219. "This requirement insures that all branches of the federal government respect the constitutional stature of Eleventh Amendment immunity and accord State sovereign immunity the protection of other constitutional rights, which will not be waived absent the 'intentional relinquishment or abandonment of a known right or privilege.'" *College Savings Bank,* 527 U.S. at 681–82, 119 S.Ct. 2219 (quoting *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938)).

Panzardi does not direct the Court to any language in the ADA that represents an unequivocal indication by Congress that states in accepting funds, in general from the federal government, do so on condition that they have knowingly waived their Eleventh Amendment protection. There is simply nothing to support Panzardi's argument that the defendants have waived their Eleventh Amendment immunity.

## 2. Abrogation of Immunity

█ Having concluded that the defendants have not waived their Eleventh Amendment immunity, the Court now addresses the issue of whether Congress exceeded its authority in Title II of the ADA when it abrogated the states Eleventh Amendment immunity.

The United States Supreme Court has visited the issue of Congress' authority under Section 5 of the Fourteenth Amendment in abrogating the States' Eleventh Amendment immunity in several recent cases. *See Board of Trustees of Univ. of Alabama v. Garrett,* 531 U.S. 356, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001) (Congress exceeded its power to abrogate the states' Eleventh Amendment immunity from suits by private individuals brought pursuant to Title I of the Americans with Disabilities Act); *Kimel v. Florida Bd. of Regents,* 528 U.S. 62, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000) (Congress exceeded its power to abrogate the states' Eleventh Amendment immunity from suits by private individuals brought pursuant to the Age Discrimination in Employment Act); *Florida Prepaid Postsecondary Educ. Expense Bd. v. College Sav. Bank,* 527 U.S. 627, 119 S.Ct. 2199, 144 L.Ed.2d 575 (1999) (invalidating Congress' attempt to abrogate state sovereign immunity in the Patent and Plant Variety Protection Remedy Clarification Act because the scope of the legislation exceeded the bounds of Congress' authority to enforce constitutional guarantees pursuant to § 5 of the Fourteenth Amendment); *College Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.,* 527 U.S. 666, 119 S.Ct. 2219, 144 L.Ed.2d 605 (1999) (invalidating as an improper exercise of its power under § 5 of the Fourteenth Amendment Congress' attempt to abrogate state sovereign immunity in the Trademark Remedy Clarification Act).

It should be noted that in *Garrett* the Supreme Court decided only the issue of whether suits for money damages brought pursuant to Title I of the ADA are barred by the Eleventh Amendment. The Supreme Court specifically stated, "[w]e are not disposed to decide the constitutional issue whether Title II, which has somewhat different remedial provisions from Title I, is appropriate legislation under § 5 of the Fourteenth Amendment when the parties have not favored us with briefing on the statutory question." *Garrett*, 121 S.Ct. at 960 n. 1. Hence, the issue is left for this Court to resolve.

The First Circuit has not rendered a decision on the issue of abrogation of Eleventh Amendment immunity under Title II of the ADA[6]. However, in dicta it stated, "[w]e also note that the University may have an Eleventh Amendment sovereign immunity defense", citing to *Kimel v. Florida Bd. of Regents* and noting that certiorari was granted in *Garrett* to address the issue whether states have Eleventh Amendment immunity from claims brought under the ADA. *Parker v. Universidad de Puerto Rico*, 225 F.3d 1, 8 (1st Cir.2000). The Third Circuit also has not rendered a decision on said issue, but determined that the States have Eleventh Amendment immunity under Title I of the ADA, said opinion decided after the Supreme Court decided *Kimel*. *Lavia v. Pennsylvania, Dep't of Corrections*, 224 F.3d 190 (3d Cir.2000). *But cf. Chisolm v. McManimon*, 275 F.3d 315 (3d Cir.2001) (implying States have Eleventh Amendment immunity under Title II of the ADA). The Fourth Circuit is split on the issue. *Compare Amos v. Maryland Dep't of Pub. Safety and Corr. Services*, 178 F.3d 212 (4th Cir.1999), *reh'g en banc granted, judgment vacated* (Dec. 28, 1999) (Congress unequivocally expressed its intent to abrogate States' sovereign immunity under ADA as it was a valid exercise of Congress' power under the Fourteenth Amendment) *with Brown v. North Carolina Div. of Motor Vehicles*, 166 F.3d 698 (4th Cir.1999) (regulation promulgated pursuant to ADA exceeded Congress' Section 5 powers such that Congress could not abrogate sovereign immunity). *But cf. Roary v. Freeman*, No. 97–7210, 2001 WL 123661 (4th Cir.2001) (calling into question Eleventh Amendment immunity in a Title II ADA claim).

In the remaining circuits there is a split on the issue of Eleventh Amendment immunity under Title II of the ADA. The Fifth, Sixth, Seventh, Eighth, Tenth and Eleventh Circuits have determined that Congress exceeded its authority by abrogating the States' Eleventh Amendment immunity. *Reickenbacker v. Foster*, 274 F.3d 974 (5th Cir.2001); *Popovich v. Cuyahoga County Court of Common Pleas*, 276 F.3d 808 (6th Cir.2002) (en banc) (Title II ADA claim barred by the Eleventh Amendment insofar as the action relies on congressional enforcement of the Equal Protection Act, but not barred insofar as the action relied on congressional enforcement of the Due Process Clause); *Walker v. Snyder*, 213 F.3d 344 (7th Cir.2000); *Alsbrook v. Maumelle*, 184 F.3d 999 (8th Cir.1999), *cert. granted in part*, 528 U.S. 1146, 120 S.Ct. 1003, 145 L.Ed.2d 947 (2000), *cert. dismissed*, 529 U.S. 1001, 120 S.Ct. 1265, 146 L.Ed.2d 215 (2000); *Thompson v. Colorado*, 278 F.3d 1020 (10th Cir.2001) (en banc); *Root v. Georgia State Bd. of Veterinary Med.*, 252 F.3d 443

---

**6.** Based upon the holding in *Garrett*, the First Circuit affirmed dismissal in an ADA, Title I case on the basis that Puerto Rico had Eleventh Amendment immunity from suit for money damages under the ADA. *Acevedo Lopez v. Police Dep't of the Commonwealth of Puerto Rico*, 247 F.3d 26 (1st Cir.2001).

(11th Cir.2001)[7]. Conversely, following the Supreme Court's decision in *Garrett* the Second and Ninth circuits have held that states are not immune under the Eleventh Amendment from actions under Title II of the ADA. *Garcia v. S.U.N.Y. Health Sci. Ctr. of Brooklyn*, 280 F.3d 98 (2d Cir.2001) (holding that a private suit for money damages under Title II of the ADA may only be maintained against a state if the plaintiff can establish that the Title II violation was motivated by either discriminatory animus or ill will due to disability); *Hason v. Medical Bd. of California*, 279 F.3d 1167 (9th Cir.2002).

Because neither the First Circuit nor the United States Supreme Court have spoken to the issue, this Court turns to the analysis utilized by the United States Supreme Court to determine if Congress validly abrogated the States' Eleventh Amendment immunity from actions brought under Title II of the ADA.

■ The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." *Board of Trustees of Univ. of Alabama v. Garrett*, 531 U.S. at 363, 121 S.Ct. 955. "The ultimate guarantee of the Eleventh Amendment is that nonconsenting States may not be sued by private individuals in federal court." *Id.; See Kimel*, 528 U.S. at 73, 120 S.Ct. 631.

■ "Congress may abrogate the States' Eleventh Amendment immunity when it both unequivocally intends to do so and acts pursuant to a valid grant of constitutional authority." *Kimel*, 528 U.S. at 73, 120 S.Ct. 631. In *Garrett* the Supreme Court was explicit that there was no dispute that Congress intended to abrogate the States' Eleventh Amendment immunity in the ADA. *Garrett*, 531 U.S. at 364, 121 S.Ct. 955; 42 U.S.C. § 12202. As is well recognized, Congress may subject nonconsenting States to suit in federal court when it does so pursuant to a valid exercise of its § 5 power.[8] *Garrett*, 531 U.S. at 364–365, 121 S.Ct. 955. Also, the ADA can apply to the States only to the extent that the statute is appropriate § 5 legislation. Moreover, the Supreme Court noted that Congress intended to invoke § 5 as one of its bases for enacting the ADA. *Garrett*, 531 U.S. at 364 n. 3, 121 S.Ct. 955; 42 U.S.C. § 12101(b)(4). Because there is no question of Congress' intent to abrogate the States' Eleventh Amendment immunity, the Court must examine whether Congress validly did so.

■ At the onset the Court is required to examine the limitations that § 1[9] of the

---

**7.** Prior to this decision the Eleventh Circuit had determined that Eleventh Amendment immunity was validly abrogated under the ADA. *See Kimel v. Florida Bd. of Regents,* 139 F.3d 1426 (11th Cir.1998). *Root* was on appeal before the Eleventh Circuit when the Supreme Court decided *Garrett.* Based upon the Supreme Court's decision in *Garrett,* the Eleventh Circuit held that Georgia never waived its immunity from suit and that a citizen may not bring a monetary claim against a state under Title II of the ADA without the prior consent of the state.

**8.** Section 5 of the Fourteenth Amendment grants Congress the power to enforce the substantive guarantees contained in § 1 by enacting "appropriate legislation." *Garrett,* 531 U.S. at 365, 121 S.Ct. 955.

**9.** Section 1 of the Fourteenth Amendment provides that "[n]o State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the

Fourteenth Amendment places upon States' treatment of the disabled. *Garrett*, 531 U.S. at 365, 121 S.Ct. 955. It is the responsibility of the United States Supreme Court to define the substance of constitutional guarantees; it is not the responsibility of Congress. *Garrett*, 531 U.S. at 365, 121 S.Ct. 955. Keeping that in mind, the Court must apply the "congruence and proportionality" test between the injury to be prevented or remedied and the means adopted to that end. *See City of Boerne v. Flores*, 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997).

 As determined by the Supreme Court in prior decisions, disabled individuals do not qualify as a "quasi-suspect" classification for equal protection purposes, but rather fall under the egis of the minimum "rational-basis" review. *Garrett*, 531 U.S. at 366–367, 121 S.Ct. 955. "Such a classification cannot run afoul of the Equal Protection Clause if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose." *Garrett*, 531 U.S. at 367, 121 S.Ct. 955 (citations omitted). What this means is "[s]tates are not required by the Fourteenth Amendment to make special accommodations for the disabled, so long

as their actions towards such individuals are rational." *Garrett, id.* Moreover, if special accommodations for the disabled are to be required, they have to come from positive law and not through the Equal Protection Clause. *Garrett*, 531 U.S. at 368, 121 S.Ct. 955.

In Title II of the ADA there is no statutory exception to Title II's duty to accommodate. As previously mentioned, Title II defines a "qualified individual with a disability" as "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2). In essence, the definition imposes an affirmative obligation on public entities to accommodate disabled individuals.

Regulations have been implemented pursuant to the ADA but they impose far more restrictions on state action than would be the case under a rational basis standard[10]. For example, the regulations

---

laws." *Garrett,* 531 U.S. at 365, 121 S.Ct. 955.

10. 28 C.F.R. § 35.10 speaks to accessibility of facilities and provides that for existing facilities:

(a) General. A public entity shall operate each service, program, or activity so that the service, program, or activity, when viewed in its entirety, is readily accessible to and usable by individuals with disabilities. This paragraph does not—

(1) Necessarily require a public entity to make each of its existing facilities accessible to and usable by individuals with disabilities;

(2) Require a public entity to take any action that would threaten or destroy the historic significance of an historic property; or

(3) Require a public entity to take any action that it can demonstrate would result in a fundamental alteration in the nature of a service, program, or activity or in undue financial and administrative burdens. In those circumstances where personnel of the public entity believe that the proposed action would fundamentally alter the service, program, or activity or would result in undue financial and administrative burdens, a public entity has the burden of proving that compliance with § 35.150(a) of this part would result in such alteration or burdens. The decision that compliance would result in such alteration or burdens must be made by the head of a public entity or his or her designee after considering all resources available for use in the funding and operation of the service, program, or activity, and must be accompanied by a written state-

for accessibility to a service, program, or activity excuse a public entity from the obligation to alter its policies, practices or procedures only if the "proposed action would fundamentally alter the service, program, or activity or would result in undue financial and administrative burdens." 28 C.F.R. § 35.150(a)(3). Moreover, the public entity "has the burden of proving that compliance would result in such alteration or burdens". *Id.* The accommodation requirement, with its limited regulatory exceptions, reaches far beyond conduct likely to violate the Equal Protection Clause using the rational basis standard. Additionally, the duty is placed on the public entity "to prove that it would suffer such a burden, instead of requiring (as the Constitution does) that the complaining party negate reasonable bases" for the state's action. *Garrett,* 531 U.S. at 372, 121 S.Ct. 955. Congress, however, may enact broad, prophylactic legislation. *Kimel,* 528 U.S. at 87, 120 S.Ct. 631.

One way to determine if Title II of the ADA is an appropriate remedy or merely an attempt to substantively redefine a State's legal obligation with respect to disability discrimination is to determine whether Congress identified a history and pattern of unconstitutional discrimination by the States against the disabled in providing services, programs or activities. *Garrett,* 531 U.S. at 368, 121 S.Ct. 955; *Kimel,* 528 U.S. at 88–89, 120 S.Ct. 631. Congress made a general finding in the ADA that "historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination ... continue to be a serious and pervasive social problem." *Garrett,* 531 U.S. at 369, 121 S.Ct. 955; 42 U.S.C. § 12101(a)(2). It

also found "discrimination against individuals with disabilities persists in such critical areas as ... public accommodations, education, transportation, communication, recreation, institutionalization, health services, voting, and access to public services." 42 U.S.C. § 12101(a)(3).

The Court has thoroughly reviewed the legislative history of the ADA. The legislative history of the statute, particularly as to Title II, suffers from the same deficiencies identified by the Supreme Court in *Kimel* and *Garrett.* There is a lack of evidence that the States have engaged in a widespread pattern of unconstitutional discrimination against the disabled when providing accommodations to public services such as in this case, access to participate in educational programs. More as, the evidence "consists almost entirely of isolated sentences clipped from floor debates." *Kimel,* 528 U.S. at 89, 120 S.Ct. 631. *See* Oversight Hearing on H.R. 4498, Americans with Disabilities Act of 1988; Hearing Before the Subcommittee on Select Education of the House Committee on Education and Labor, 100th Cong. 100–109 (Oct. 24, 1988) (statement of Ilona Durkin) ("State agencies discriminate against people with traumatic brain injury because of their disability"), WL A & P Hearings H.R. 4498, at *50–51; (statement of Linda Pelletier) (while attending a college reunion was unable to attend several events because of barriers such as stairs), WL A & P Hearings H.R. 4498, at *32; (statement of Emeke Nwojke) (describing barriers in attempting to gain access to courtroom); WL A & P Hearings H.R. 4498, at *40–41; (statement of Bonnie O'Day) (describing the death of an individual at a state university who was forced to traverse

ment of the reasons for reaching that conclusion. If an action would result in such an alteration or such burdens, a public entity shall take any other action that would not

result in such an alteration or such burdens but would nevertheless ensure that individuals with disabilities receive the benefits or services provided by the public entity.

a dangerous grassy area because an intersection did not have a curve cut), WL A & P Hearings H.R. 4498, at *45–46; (statement of Ellen Telker) (explaining that state and local municipalities do not make materials available to a person who is unable to read print and that at least one courthouse in Connecticut did not have tactile markings in the elevators), WL A & P Hearings H.R. 4498, at *48–49; (statement of Melissa Marshall) (inaccessible multi-building campus at a state university law school), WL A & P Hearings H.R. 4498, at *72–74; (statement of Eileen Healy Horndt) (some state commissions on the deaf and hearing impaired are considering whether or not they can continue to provide interpreting services when they are unable to charge for these services), WL A & P Hearings H.R. 4498, at *87–90; (statement of Barbara Waters) (asked to leave a state college as a result of her epileptic seizures), WL A & P Hearings H.R. 4498, at *132–133; (statement of Denise Karuth) (due to inability to read a photo-reduced score had to drop a required theory course at a state university), WL A & P Hearings H.R. 4498, at *194–196; (statement of Linda Mills) (explained difficulties in obtaining driver's license and modification of van for driving). Legislative History of Public Law 101–336, the Americans with Disabilities Act, Committee Print prepared for the House Education and Labor Committee, 101st Cong., Vol. 3 (Dec.1990), WL A & P ADA Comm. Print 1990(28B), at 1186–1187; and Hearing on H.R. 2273, Americans with Disabilities Act of 1989 Hearing Before the Subcommittee on Select Education of the Committee on Education and Labor House of Representatives Hearing Held in Indianapolis, IN, 101st Cong. (October 6, 1989) (statement of Rick Edwards) (state code

provides for issuance of handicapped placards but handicapped spaces are filled with abusers), WL A & P Hearings S. 2273, at *63–64; and Americans with Disabilities Act of 1989; Hearings Before the Committee on Labor and Human Resources and the Senate Subcommittee on the Handicapped, 101st Cong. 101–156 (Sept. 20, 1989) (statement of Laura Oftedahl) (describing barriers to accessing information from public agencies in Braille, large-print, recorded, or computer-accessible form), WL A & P ADA Comm. Print 1990(28C), at *3075–2079.

Also, of import is that the legislative history demonstrates that Title II, for the most part, was designed to achieve consistency between federally funded programs, already covered by the Rehabilitation Act of 1973, and other government programs. *See* S.Rep. No. 101–116, at 12 (1989), WL A & P S.Rep. 101–116, at *2; H.R.Rep. No. 101–485, part 2, at 37 (1990), WL A & P H.R. Rep. 101–485(II), at *23. Clearly, providing a "uniform remedy" by placing States on the "same footing" as other entities governed by federal law, does not fall within its Fourteenth Amendment enforcement powers. *Florida Prepaid,* 527 U.S. at 647, 119 S.Ct. 2199. Indeed, Title II cannot be considered preventive or remedial legislation that is congruent and proportional to any constitutional violation. *Thompson v. Colorado,* 278 F.3d 1020, 1034 (10th Cir.2001) (*en banc*).[11] Congress' failure to recognize this distinction between unconstitutional and constitutional discrimination, and to incorporate it into the statute, leaves the accommodation remedy far out of proportion to any identified constitutional violation. *See, Thompson. Colorado,* 278 F.3d at 1033. Neither

---

**11.** Rather Title II requires public entities to recognize the unique position of the disabled and to make favorable accommodations on their behalf. *Thompson v. Colorado,* 278 F.3d at 1031.

the ADA's legislative history, nor Congress's findings found in the statute itself, responds to a "history of 'widespread and persisting deprivation of constitutional rights.'" *Florida Prepaid,* 527 U.S. at 645, 119 S.Ct. 2199, *quoting City of Boerne,* 521 U.S. at 526, 117 S.Ct. 2157.

Based upon the foregoing, the Court finds that Congress exceeded its authority in abrogating the States' Eleventh Amendment immunity in suits brought pursuant to Title II of the ADA. As a result, the suit brought in this federal court by Panzardi to recover monetary damages against the defendants pursuant to Title II of the ADA is barred by the Eleventh Amendment.

Therefore, the Commonwealth and UPR's motions for summary judgment on the issue of sovereign immunity in Title II of the Americans with Disabilities Act are **GRANTED** (Docket Nos. 110, 112). All claims for damages brought pursuant to Title II of the ADA against the Commonwealth and the UPR are barred by the Eleventh Amendment.

## C. Prima Facie Case

The Commonwealth moves for summary judgment on the issue of whether Panzardi establishes a prima facie case under the Title II of the ADA and the Rehabilitation Act (Docket Nos. 100, 105). The Commonwealth contends that in order to establish a claim Panzardi must have demanded a reasonable accommodation in addition to meeting the other requisites listed below. The Commonwealth argues that because it did not have knowledge of Panzardi's condition and because she did not ever request a reasonable accommodation, there could be no discrimination by the Commonwealth, much less a denial of services, access to programs, or reasonable accommodations. Therefore, it asserts that the claims brought against it should be dismissed with prejudice.

Panzardi argues that there is nothing that places upon a disabled person the responsibility or obligation to request a reasonable accommodation. Moreover, Panzardi contends that because her condition is apparent, obvious and patent, and was known to defendants, there was no obligation to demand a reasonable accommodation.

In order to establish a prima facie case under Title II of the ADA, a plaintiff must show that (1) she is a qualified individual with a disability; (2) she was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities or was otherwise discriminated against; and (3) that such exclusion, denial of benefits, or discrimination was by reason of the plaintiff's disability. *Parker v. Universidad de Puerto Rico,* 225 F.3d 1, 5 (2000). The Rehabilitation Act contains the additional requirements that "the plaintiff show the program or activity from which she is excluded received federal financial assistance" *Rivera–Flores v. Puerto Rico Tel. Co.,* 64 F.3d 742 (1st Cir.1995).

The Commonwealth is essentially claiming that Panzardi has failed to meet her burden of proving that she was excluded from the benefit, program or activity due to the discrimination based upon her disability. Panzardi admits that she did not request accommodation from the Commonwealth. Moreover, there is nothing in the record which indicates that the Commonwealth knew of Panzardi's physical limitations. Panzardi contends, however, that the UPR had knowledge that Panzardi was a qualified individual, that her condition was obvious and apparent, that she had requested a transfer to RUM, that she met a professor at RUM during her visit there who later informed the head of the RUM

Equal Employment Opportunity Commission (EEOC) of Panzardi's visit and interests in transferring to RUM, and that the RUM EEOC was aware of the architectural barriers at RUM.[12] In essence, Panzardi argues that the actions of the UPR are imputed to the Commonwealth.

The Commonwealth is not automatically liable for any alleged actions or inactions taken by the UPR. Indeed, there must be an independent theory of liability against the Commonwealth. More as, the law which created the UPR specifies that it is a separate entity from the Commonwealth with its own capacity to sue and be sued. *See* 1993 P.R. Laws, Act 16, § G(1) ([The University of Puerto Rico] shall have the authority to sue and be sued).

■ In addition, with regard to causes brought pursuant to the Rehabilitation Act, in educational settings, the First Circuit stated, "an academic institution can be expected to respond only to what it knows (or is chargeable with knowing)". *Wynne v. Tufts Univ. Sch. of Med.*, 976 F.2d 791, 795 (1st Cir.1992). "This means, that 'to be liable under the Rehabilitation Act, [the institution] must know or be reasonably expected to know of [a student's] handicap.'" *Id. citing Nathanson v. Medical Coll. of Pa.*, 926 F.2d 1368, 1381 (3d Cir. 1991). This requirement of knowledge has also been applied to ADA cases. *See Ferrell v. Howard Univ.*, No. Civ.A. 98–1009, 1999 WL 1581759 *6 (D.D.C. Dec.2, 1999), *aff'd*, 99–7276, 2000 WL 1030362 (D.C.Cir.

July 18, 2000) (Case dismissed when the court held that the defendants could not be found to have violated the ADA or the Rehabilitation Act for failing to grant an accommodation to plaintiff based on an alleged disability of which it had no knowledge, nor any reason to know, while plaintiff was enrolled in the College of Medicine).

■ The record reflects that while Panzardi had been admitted, had enrolled and attended classes at the Bayamóm Campus, however, it is undisputed that Panzardi did not attend classes or even enroll for classes at RUM. Therefore, a giant leap must be made in order to satisfy the prong that she was excluded from participation or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the Commonwealth. The Court is hard pressed to see how Panzardi was excluded from programs, benefits or activities, when she never enrolled for classes at RUM or attempted to attend even one class.

The facts before the Court are that Panzardi applied for a transfer to RUM in March 1993. She visited the RUM campus during Holy Week, which ran from April 4, 1993 (Palm Sunday) to April 11, 1993 (Easter Sunday). She then applied for enrollment at the University of Maryland on April 26, 1993, by sending a confirmation of enrollment. On May 10, 1993,

---

12. The evidence on record points to the fact that Panzardi had applied and had been admitted to the UPR, Bayamón Campus. There was a time in which she expressed an interest in transferring to RUM (Mayaguez Campus), inasmuch as she was interested in being admitted to the Engineering Faculty. Thus, she requested a transfer. Consistent with her interest, during Easter vacation and recess at RUM, Panzardi, along with her parents, visited the RUM Campus. This visit was not part of an interview or admission process. More

so, at the time administrative offices were closed. As a result of chance, Panzardi encountered a professor who sympathized with her and her interest in pursuing a career in engineering. To some extent, this professor enabled Panzardi to tour the campus. After this visit, Panzardi never went back to the campus nor did she pursue enrollment. Nonetheless, the professor, having gained awareness of the existing architectural barriers, commissioned her students to make an investigation and project on the subject.

after enrolling at the University of Maryland, Panzardi was notified by RUM that her application for external transfer to the Civil Engineering Department was favorably recommended for the First Semester 1993–1994 and that she should contact said department prior to May 28, 1993. Subsequent to Panzardi's enrollment at the University of Maryland, Professor Saldaña, with whom Panzardi had her chance meeting during the Holy Week visit, assigned a project to her students regarding the accessibility and/or architectural barriers at the campus. On May 28, 1993, Dr. Saldaña then corresponded with Mr. Rufino Matos, head of the Equal Employment Opportunity Office at RUM and provided to him copies of her students' reports. During this same time the Registrar's Office continued to correspond with Panzardi regarding pre-registration of classes. On June 2, 1993, over a month after Panzardi had submitted her enrollment to the University of Maryland, Dr. Saldaña wrote to Panzardi wishing her success, telling her that she had left a mark on the campus and advising her that Director Alejandro Ruiz–Acevedo was interested in removing the architectural barriers at the campus. However, at this stage, Panzardi had decided to enroll at the University of Maryland, event that can be clearly and reasonably inferred from Dr. Saldaña's letter to Panzardi. A careful reading of the letter indicates that Dr. Saldaña is aware that Panzardi will not be attending the RUM campus as it states, "[h]ere at the College you would have had the support of many students and professors. However, it has fallen on you to blaze trails in other places. I hope that some day you can return to Puerto Rico with your degree (profession) and continue to trail-blaze." *See* Docket No. 100, Joint Ex. 1.

**13.** There is no dispute that State Road # 108 is owned by the Commonwealth. *See Docket*

Nothing leads to the conclusion that the Commonwealth had knowledge of Panzardi's disability much less that Panzardi attempted to and was not allowed to avail herself of the programs, activities or benefits at the UPR because of actions or inactions taken by the Commonwealth. Panzardi acknowledged that she did not contact the Dean of student affairs or anyone else at RUM regarding the architectural barriers that she encountered. Because Panzardi does not allege an independent theory of liability against the Commonwealth, the Commonwealth is entitled to summary judgment on those allegations based upon the alleged actions or inactions of the UPR. Summary judgment is **GRANTED** to the Commonwealth on the issue that Panzardi fails to make a prima facie case that she was excluded from a benefit or program due to the discrimination based upon her disability under Title II of the ADA and the Rehabilitation Act (Docket No. 105).

Panzardi also claims the Commonwealth discriminated against her by reason of her disability because State Road # 108 [13] is inaccessible to persons with disabilities. Once again the Commonwealth contends that in order to state a claim she must have requested a reasonable accommodation. Panzardi, of course disagrees. She argues that the Commonwealth has an obligation to see that access to State Road # 108 complies with the ADA and the Rehabilitation Act.

State Road # 108 separates the civil engineering building from RUM's main campus. A pedestrian pathway was built over the relevant part of State Road # 108, but it did not include ramps to make the pathway accessible to students in wheelchairs.

*No. 100, Joint Ex. 62.*

The result, Panzardi argues, is that the Commonwealth violated the ADA and the Rehabilitation Act as well as the federally protected rights of Panzardi in reckless disregard of her federally protected rights.

The Court reviewed numerous cases to determine if a plaintiff is required to request accommodation in order to make a prima facie case in an arena outside of an educational setting. The cases cited by the Commonwealth were either employment or education discrimination cases. Cases involving access generally proscribe to the theory that a plaintiff bringing a claim alleging inadequate access to a facility does not have to formally request accommodation. See *Layton v. Elder*, 143 F.3d 469 (8th Cir.1998); *Schonfeld v. City of Carlsbad*, 978 F.Supp. 1329 (S.D.Cal. 1997).

Streets are considered facilities pursuant to ADA regulations and consequently curb ramps and walkways are also subject to requirements for program accessibility. *See* 28 C.F.R. 35.150; 28 C.F.R. 35.151. In determining whether a facility is accessible under both Title II and the Rehabilitation Act, the applicable regulations make a distinction between existing facilities and new construction and alterations. Regarding existing facilities, Title II requires that "[a] public entity shall operate each service, program, or activity so that the service, program, or activity, when viewed in its entirety, is readily accessible to and usable by individuals with disabilities". 28 C.F.R. § 35.150(a). The foregoing paragraph does not "necessarily require a public entity to make each of its existing facilities accessible to and usable by individuals with disabilities." 28 C.F.R. § 35.150(a)(1). The regulations, however, provide a time limitation for existing facilities. "Where structural changes in facilities are undertaken to comply with the obligations established under this section,

such changes shall be made within three years of January 26, 1992, (i.e. January 26, 1995) but in any event as expeditiously as possible. 28 C.F.R. § 35.150(c).

The regulatory language of the Rehabilitation Act mirrors that of Title II. *See for example* 28 C.F.R. § 41.57(a)

A recipient shall operate each program or activity so that the program or activity, when viewed in its entirety, is readily accessible to and usable by handicapped persons. This paragraph does not necessarily require a recipient to make each of its existing facilities or every part of an existing facility accessible to and usable by handicapped persons.

28 C.F.R. § 41.57(a).

A time frame is also provided "[w]here structural changes are necessary to make programs or activities in existing facilities accessible, ... as soon as practicable, but in no event later than three years after the effective date of the agency regulation." *See* 28 C.F.R. § 41.57(b).

By comparison, regulations governing new construction and alterations of existing facilities are substantially more stringent. Pursuant to Title II, facilities "shall, to the maximum extent feasible, be altered in such manner that the altered portion of the facility is readily accessible to and usable by individuals with disabilities, if the construction or alteration was commenced after January 26, 1992." 28 C.F.R. § 35.151(a), (b). Similarly, the Rehabilitation Act provides that "new facilities shall be designed and constructed to be readily accessible to and usable by handicapped persons" and, "[a]lterations to existing facilities shall, to the maximum extent feasible, be designed and constructed to be readily accessible to and usable by handicapped persons." 28 C.F.R. § 41.58(a).

 The record does not contain any evidence of when the pedestrian pathway was built. Nor has any party provided this information to the Court. Hence, the Court is unable to determine whether the pathway at issue is an "existing facility" or a "new facility" or an "alteration" under the regulation. Inasmuch as both the ADA and the Rehabilitation Act contain time limitations for compliance, it may be at the time of the alleged noncompliance with the ADA and/or the Rehabilitation Act, the Commonwealth's time limitation for complying with the regulations had not yet expired. Alternatively, it may be that either under the ADA or the Rehabilitation Act, State Road # 108 and its walkway, when viewed in their entirety, are accessible. There are too many unanswered questions. At this juncture, summary judgment is not proper. Therefore, the Commonwealth's motion for summary judgment that Panzardi fails to state a claim as to State Road # 108 is **DENIED** (Docket No. 105).

In Panzardi's response to the motion for summary judgment she asserts that the Court may enter summary judgment on her behalf on the basis that the facts are unrefuted in that the Commonwealth violated the ADA and the Rehabilitation Act (Docket No. 100). The Court respectfully declines this invitation, noting that Panzardi failed to provide analysis and argument. Moreover, based on the record before the Court, there remain genuine issues of material fact, precluding summary judgment for both the Commonwealth and Panzardi.

### D. Compensatory Damages

The Commonwealth moves for summary judgment arguing that Panzardi's request for compensatory damages is barred by the applicable law under the ADA and The Rehabilitation Act (Docket No. 105). Although the UPR did not file a separate motion regarding Panzardi's request for compensatory damages, it also seeks to dismiss Panzardi's prayer for compensatory damages as it replied jointly with the Commonwealth to objections made by Panzardi regarding the dismissal of her request for compensatory damages. *See* Docket No. 98.

As noted above in Section III.B.2, because the defendants' sovereign immunity was not validly abrogated under Title II of the ADA, private individuals may not recover money damages against them. *See Board of Trustees of Univ. of Alabama v. Garrett*, 531 U.S. 356, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001); *Kimel v. Florida Bd. of Regents*, 528 U.S. 62, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000). Therefore, Panzardi is not entitled to compensatory damages under the ADA. The Commonwealth and the UPR's motions for summary judgment and to deny request for compensatory damages are **GRANTED** (Docket Nos. 98, 105). Panzardi is barred from seeking compensatory damages under Title II of the ADA.

The Court now turns to the issue of whether Panzardi is entitled to pursue a claim for compensatory damages pursuant to the Rehabilitation Act.[14] The defendants argue that since the Rehabilitation Act incorporates the recovery provisions of Title VII, which only allow the equitable relief or remedies of injunctive relief or back pay, Panzardi's claim for compensatory damages is barred by applicable law. Panzardi, of course, argues that she is entitled to recover compensatory damages under the Rehabilitation Act. More so, be-

---

14. Both the Commonwealth and Panzardi discuss punitive damages in the motions and responses. However, the Amended Complaint does not ask for punitive damages. *See* Docket No. 21. Accordingly, the Court sees no need to discuss this issue.

cause she claims that she is the victim of intentional discrimination.

The First Circuit has not decided whether compensatory damages (other than backpay) are available under Section 504 of the Rehabilitation Act. *Parker v. Universidad de Puerto Rico*, 225 F.3d 1, 8 (1st Cir.2000). The remedial provision of the Rehabilitation Act which applies to this case states that:

> The remedies, procedures, and rights set forth in title VI of the Civil Rights Act of 1964 [42 U.S.C.A. § 2000d et seq.] shall be available to any person aggrieved by any act or failure to act by any recipient of Federal assistance or Federal provider of such assistance under section 794 of this title.

Title 29 U.S.C. § 794a(a)(2).

 Title 29 U.S.C. § 794a(a)(2) incorporates the remedies, procedures, and rights provisions of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.* "Title VI of the Civil Rights Act, like Section 504 of the Rehabilitation Act, is silent as to the availability of a private cause of action and private remedies." *Moreno v. Consolidated Rail Corp.,* 99 F.3d 782, 788 (6th Cir.1996). However, the law is well settled that intentional violations of Title VI and, therefore, the Rehabilitation Act, can call for an award of money damages. *Bartlett v. New York State Bd. of Law Examiners,* 156 F.3d 321 (2d Cir.1998), *vacated on other grounds,* 527 U.S. 1031, 119 S.Ct. 2388, 144 L.Ed.2d 790 (1999). Indeed, most circuits have relied upon the United States Supreme Court's ruling in *Franklin v. Gwinnett County Pub. Sch.,* 503 U.S. 60, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992) in determining that compensatory damages are available for violations of the Rehabilitation Act. In *Franklin,* the Supreme Court held that compensatory damages were available under Title IX of the Education Amend-

ments of 1972, 20 U.S.C. §§ 1681–1688. Title IX contains language similar to that found in Section 504 of the Rehabilitation Act and for which no private cause of action was expressly provided. *Moreno v. Consolidated Rail Corp.,* 99 F.3d at 789. Therefore, based upon the ruling in *Franklin* that damages are available in Title IX cases, and the similarities to Section 504, Courts have applied *Franklin* to cases where compensatory damages are sought pursuant to the Rehabilitation Act.

More as, following *Franklin,* there has been agreement among most circuits that intentional violations under the Rehabilitation Act can call for an award of money damages. *See Bartlett v. New York State Bd. of Law Examiners,* 156 F.3d 321, 331 (2nd Cir.1998), *vacated on other grounds,* 527 U.S. 1031, 119 S.Ct. 2388 (1999) (bar applicant who was disabled under the Rehabilitation Act was entitled to compensatory damages for violation of her right to reasonable accommodation in taking bar examination); *W.B. v. Matula,* 67 F.3d 484, 494 (3d Cir.1995) (student with learning disabilities could seek monetary damages from school directly under the Rehabilitation Act, as well as on federal civil rights claim predicated on the Rehabilitation Act); *Panazides v. Virginia Bd. of Educ.,* 13 F.3d 823, 830 (4th Cir.1994) (because of the similarity between Title IX and § 504 of the Rehabilitation Act, compensatory damages are available for intentional discrimination); *Moreno v. Consolidated Rail Corp.,* 99 F.3d 782, 789 (6th Cir.1996) (every circuit that has reach the issue after *Franklin* has held that compensatory damages are available under [the Rehabilitation Act]); *Ferguson v. City of Phoenix,* 157 F.3d 668 (9th Cir.1998) (deaf and hearing-impaired users of 9–1–1 emergency telephone service commenced action under Rehabilitation Act could not recover compensatory damages under the Rehabil-

itation Act absent a showing of discriminatory intent); *Wood v. President and Trustees of Spring Hill Coll. in City of Mobile*, 978 F.2d 1214 (11th Cir.1992) (student proceeding under a theory of disparate treatment in Section 504 action must prove intentional discrimination or bad faith in order to recover compensatory damages).

In her opposition Panzardi asserts that she has alleged and can prove intentional discrimination. She argues that she was a student at the UPR, Bayamón Campus when she applied and was accepted to transfer to the engineering program at RUM. According to Panzardi, her advisors and the administration at the Bayamón campus were aware of her disability and that she desired to transfer to RUM. During her subsequent visit to RUM, Panzardi met Dr. Saldaña who acknowledged that RUM had many architectural barriers. Saldaña then through her communications with Matos made the administration aware of the barriers. Panzardi also claims that the Commonwealth intentionally discriminated against her because of the inaccessibility of State Road # 108. As previously discussed, it is unclear if in fact State Road # 108 violates either Title II of the ADA of the Rehabilitation Act. Moreover, even if Panzardi can prove such a violation, at this time the Court is unpersuaded that same constitutes intentional discrimination.

The defendants contend that Panzardi cannot prove intentional discrimination, noting that because Panzardi never registered at RUM she was not actually a student there. They also point out that Panzardi unilaterally decided to go the University of Maryland after visiting RUM during Holy Week vacation. Hence, UPR argues that Panzardi was never denied the opportunity to study at RUM because she failed to follow through on her plans to attend school there. As

to the UPR's alleged notice of architectural barriers, defendants note that Saldaña's letter to the RUM EEOC was written **after** Panzardi had decided not to attend RUM. Additionally, the UPR contends Panzardi cannot prove intentional discrimination because it has complied with the requisites of the ADA and the Rehabilitation Act indicating that it formulated a transition plan, conducted a self-evaluation, its modifications comply with the ADA and the existing services, when viewed in their entirety, are accessible. The UPR, however, provides no documentation or citations to the law to support this argument. *See* Docket No. 98. Finally, the Commonwealth contends that municipal governments, not the Commonwealth, have the duty to maintain sidewalks on both sides of a state road in good condition. *See* Docket No. 98. Again, there is no supporting documentation or citations to the law.

Currently, a genuine factual dispute exists as to whether Panzardi can prove intentional discrimination and, as such, the Court **DENIES** the defendants' motion for summary judgment and motion to deny request for compensatory damages for the claim brought pursuant to the Rehabilitation Act (Docket Nos. 98, 105). Yet, the Court also finds that Panzardi has not yet proven intentional discrimination. Hence, at trial defendants are given leave to reinstate their motion to dismiss Panzardi's prayer for compensatory damages for claims brought under the Rehabilitation Act at the conclusion of plaintiff's case-in-chief. If, however, Panzardi is able to prove intentional discrimination, then she will have the right to seek compensatory damages.

### E. Right to a Jury Trial

██ The Commonwealth moves for summary judgment on the issue of the

right to a jury trial (Docket No. 105). The UPR also moves to strike Panzardi's jury demand (Docket No. 86). Panzardi contends that she is entitled to a trial by jury, particularly in light of the fact that she alleges intentional discrimination.

The Commonwealth argues that Panzardi's request for a jury trial pursuant to Title II of the ADA and the Rehabilitation Act is barred, as these statutes incorporate the recovery provisions of Title VII, which only allow equitable relief or remedies, such as injunctive relief or back pay. The Commonwealth relies upon *Rivera Flores v. Puerto Rico Tel. Co.*, 776 F.Supp. 61 (D.P.R.1991), which held that the Rehabilitation Act did not provide a statutory right to a jury trial. The Court, notes, however, that although the jury demand was initially stricken, at some time during the litigation it was reinstated as is easily discerned by reading the appellate court decision of this case. *See Rivera–Flores v. Puerto Rico Tel. Co.*, 64 F.3d 742 (1st Cir.1995).

The UPR moves to strike Panzardi's request for a jury trial on the grounds that there is no right to a jury trial under Title II of the ADA. The UPR also references the Rehabilitation Act in its motion to strike thereby implying that it seeks to strike the jury demand for that claim as well. The UPR's research revealed that in non-employment discrimination claims, there is no right to a jury trial absent a showing of intentional discrimination (Docket No. 96, p. 2).

As previously determined by this Court, because the defendants' sovereign immunity was not validly abrogated under Title II of the ADA, private individuals may not recover money damages against them. *See Board of Trustees of Univ. of Alabama v. Garrett*, 531 U.S. 356, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001); *Kimel v. Florida Bd. of Regents*, 528 U.S. 62, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000). Since Panzardi is

only entitled to seek equitable relief on her ADA claim, the motion for summary judgment and to strike jury demand are **GRANTED** as to the ADA claim (Docket Nos. 86, 105).

The Rehabilitation Act does not indicate on its face whether a jury trial is available to litigants. *DeLeo v. City of Stamford*, 919 F.Supp. 70, 75 (D.Conn.1995); 29 U.S.C. § 794a(2). However, the Supreme Court's decision in *Franklin v. Gwinnett County Pub. Schools*, 503 U.S. 60, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992), allowing for compensatory damages under Title IX leads to the conclusion that a jury trial may be appropriate in such circumstances. *See* Section III.D. *supra.*

 More as "[t]he Seventh Amendment preserves the right to a jury trial in 'suits at common law' filed in federal court" which include suits in which legal rights and remedies are to be determined. *Kampa v. White Consolidated Indus., Inc.*, 115 F.3d 585, 586 (1997). The Supreme Court has established a two-pronged standard to resolve the issue of the availability of a jury trial under the Seventh Amendment when the statute does not provide the answer on its face. *See Chauffeurs, Teamsters & Helpers, Local No. 391 v. Terry*, 494 U.S. 558, 565, 110 S.Ct. 1339, 108 L.Ed.2d 519 (1990). First, the nature of the statutory action is compared to 18th century actions brought in the English courts prior to the merger of the courts of law and equity. *Id.* (citing *Tull v. United States*, 481 U.S. 412, 417–18, 107 S.Ct. 1831, 95 L.Ed.2d 365 (1987)). Second the remedy sought is examined to determine whether it is legal or equitable in nature. *Id.* Regarding the first inquiry, it is true that there were no discrimination actions at common law. *Waldrop v. Southern Co. Services, Inc.*, 24 F.3d 152, 156 (11th Cir. 1994). As to the second inquiry, Rehabilitation Act claims involving injuries to indi-

viduals are analogous to personal injury claims. *Panazides v. Virginia Bd. of Educ.*, 13 F.3d 823, 829 (4th Cir.1994). Moreover, money damages are "the traditional form of relief offered in the courts of law." *Curtis v. Loether*, 415 U.S. 189, 196, 94 S.Ct. 1005, 39 L.Ed.2d 260 (1974).

■■■ As noted above, the UPR acknowledged that there is no right to a jury trial, absent a showing of intentional discrimination. Of note is that *Matthews v. Jefferson*, 29 F.Supp.2d 525, 537 (W.D.Ark. 1998), holds that in Rehabilitation Act cases when a plaintiff claims intentional discrimination exists and seeks legal relief in the form of monetary damages, a jury trial is available. However, a jury trial is not constitutionally required in every Rehabilitation Act case. *Id.* Also, while *Tyler v. City of Manhattan*, 849 F.Supp. 1442 (D.Kan.1994) did not provide for a jury trial in a Rehabilitation Act, *Tyler* is easily distinguishable as there was no claim of intentional discrimination and the Court determined the issues could best be resolved through injunctive relief. Here, Panzardi alleges she was a victim of intentional discrimination. As previously determined, there is a genuine issue of material fact whether she was in fact the victim of intentional discrimination. Hence, at this time striking the jury demand on the claims brought under the Rehabilitation Act is premature and granting summary judgment would be improper. Accordingly, defendants' motions for summary judgment and to strike jury demand for the Rehabilitation Act claim are **DENIED** (Docket Nos. 85, 105).

Currently, a jury trial is available to Panzardi for her Rehabilitation Act claim as she alleges intentional discrimination and seeks legal relief in the form of monetary damages. This Court previously determined that Panzardi has not proven intentional discrimination. III.D., *supra*, at 31. Hence, at trial at the conclusion of plaintiff's case-in-chief defendants are given leave to move to strike the jury. If Panzardi has not proven intentional discrimination, the jury will be dismissed. If, however, Panzardi is able to prove intentional discrimination, then the jury will hear the remainder of the case to determine how much, if any, compensatory damages are required to compensate Panzardi.

Finally, this Court notes that it, and not the jury, will determine whether to award any of the equitable relief [15] requested by Panzardi. In cases which combine legal and equitable claims, a jury must decide the former, including issues of fact common to both sets of claims. *Gallagher v. Wilton Enterprises, Inc.*, 962 F.2d 120, 122 n. 3 (1st Cir.1992) (citing *Tull v. United States*, 481 U.S. 412, 425, 107 S.Ct. 1831, 95 L.Ed.2d 365 (1987); *Curtis v. Loether*, 415 U.S. 189, 196 n. 11, 94 S.Ct. 1005, 39 L.Ed.2d 260 (1974)). The bench can then pass upon the equitable claims. *See Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 508, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959).

## F. Article 1802 of the Puerto Rico Civil Code

On March 29, 1999, the UPR moved to dismiss the claims brought against it pursuant to Article 1802 of the Puerto Rico Civil code (Docket No. 86). Panzardi and all other plaintiffs then voluntarily dismissed their state law claims of negligence against the UPR on April 12, 1999 (Docket

---

**15.** It may be that Panzardi's claims for injunctive relief are moot or that she no longer has standing to obtain same, particularly if she cannot demonstrate a likelihood that she will suffer future discrimination at the hands of the defendants. *Levy v. Mote*, 104 F.Supp.2d 538, 546 (D.Md.2000).

No. 94). The next day Panzardi moved to reinstate the claim brought pursuant to Article 1802 of the Puerto Rico Civil Code (Docket No. 96). The remaining plaintiffs do not seek reinstatement as they concede that their claims are barred by the applicable limitation period (Docket No. 96). Accordingly, pursuant to Fed.R.Civ.P. 41(a) plaintiffs Santiago Panzardi–Alvarez, Ana Hilda Santiago–Figueroa, Yilda Panzardi–Santiago and Gisela Panzardi–Santiago are **DISMISSED,** without prejudice.

Panzardi contends that her claim is properly before the Court pursuant to supplemental jurisdiction as the state claim derives from the same common nucleus of operative facts as the federal claims. *See* 28 U.S.C. § 1367. Conversely, the UPR argues that the state claim is barred by the Eleventh Amendment.

As is well established, "[t]he University of Puerto has been found to be an 'arm of the state' within the purview of the Eleventh Amendment" such that it is immune from suits brought in federal courts. *Mandavilli v. Maldonado*, 38 F.Supp.2d 180, 205 (D.P.R.1999) (quoting *Pinto v. Universidad De Puerto Rico*, 895 F.2d 18 (1st Cir.1990)). Hence, unless there is an explicit waiver of sovereign immunity, the UPR is immune from suit. *See Silva v. Universidad de Puerto Rico*, 817 F.Supp. 1000 (D.Puerto Rico 1993). This District has previously found that Article 1802 of the Puerto Rico Civil Code does not contain a waiver of sovereign immunity. *Mandavilli*, 38 F.Supp.2d at 205.

 Panzardi's argument that this court has supplemental jurisdiction over the state claim, does not overcome the fact that UPR is immune from suit by reason of the Eleventh Amendment. The cases cited by Panzardi are distinguishable. More particularly, the defendant in *Hernández v. City of Hartford*, heavily relied upon by Panzardi, is not a state or an arm of a state, but rather is a city. 959 F.Supp. 125 (D.Conn.1997). As is well known, Eleventh Amendment immunity does not extend to municipalities and local governments. *Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Finally, Panzardi provides no support for her argument that because the ADA contains a waiver of Eleventh Amendment immunity, said waiver extends to all supplemental claims brought against a state in the same proceeding. Moreover, "[t]he potential for supplemental federal jurisdiction over state law claims cannot abrogate a state's Eleventh Amendment immunity." *Zimmerman v. State of Or. Dep't of Justice*, 983 F.Supp. 1327, 1330 (D.Or.1997), *aff'd*, 170 F.3d 1169 (9th Cir. 1999), *cert. denied*, 531 U.S. 1189, 121 S.Ct. 1186, 149 L.Ed.2d 103 (2001). Finally, as discussed in Section III.B. *supra*, this Court has determined that the Congress did not validly abrogate the States' Eleventh Amendment immunity in Title II of the Americans with Disabilities Act.

Based on the foregoing, the UPR's motion to dismiss the claim brought pursuant to Article 1802 of the Puerto Rico Civil Code is **GRANTED** (Docket No. 86). Panzardi's Motion to Reinstate the supplemental claim is **DENIED** (Docket No. 96).

## IV. Unserved Defendants

Defendants AB Insurance Co., BC Insurance Company, John Doe and Richard Roe have not been served with summons and complaint. The original complaint was filed on October 26, 1995, and the amended complaint was filed on June 24, 1996 (Docket Nos. 1, 21). Rule 4(m) of the Federal Rules of Civil Procedure provide that service of summons and complaint are to be made upon defendants within 120 days after the filing of the complaint. Rule 4(m) also provides that the court on

its own initiative after notice to the plaintiff shall dismiss the action without prejudice as to any defendant who has not been served within the statutory time period. Additionally, Local Rule 313 provides for dismissal for want of prosecution when process has not been served upon a defendant within 120 days after the filing of the complaint.

Panzardi has had ample time to serve Defendants AB Insurance Co., BC Insurance Company, John Doe and Richard Roe. Therefore, Panzardi is given ten (10) days from the date of this order to file a brief with this Court on the issue of why the Court should not dismiss the unserved defendants.

## V. Conclusion

For the reasons stated above the Court rules as follows:

1. The stay of this case is lifted.

2. The Commonwealth and the UPR's Motions for Summary Judgment based upon Sovereign Immunity are **GRANTED** (Docket Nos. 110, 112). All claims for damages brought pursuant to Title II of the ADA against the Commonwealth and the UPR are barred by the Eleventh Amendment.

3. The Commonwealth's motion for summary judgment that Panzardi fails to make a prima facie case under Title II of the ADA and the Rehabilitation Act that she was excluded from a benefit or program at the University of Puerto due to discrimination based upon her disability is **GRANTED** (Docket No. 105).

4. The Commonwealth's motion for summary judgment that Panzardi fails to make a prima facie case under Title II of the ADA and the Rehabilitation Act as to State Road # 108 is **DENIED** (Docket No. 105).

5. Panzardi's motion for summary judgment that the Commonwealth violated the ADA and the Rehabilitation Act is **DENIED** (Docket No. 100).

6. The defendants' motions for summary judgment and motion to dismiss Panzardi's prayer for compensatory damages under the ADA are **GRANTED** (Docket Nos. 98, 105). Panzardi is barred from seeking compensatory damages under Title II of the ADA.

7. The defendants' motions for summary judgment and motion to dismiss Panzardi's prayer for compensatory damages under the Rehabilitation Act are **DENIED** (Docket Nos. 98, 105). At trial at the conclusion of plaintiff's case-in-chief defendants are given leave to reinstate their motion to dismiss Panzardi's prayer for compensatory damages for claims brought under the Rehabilitation Act should they so desire.

8. The defendants' motions for summary judgment and to strike jury demand for claims under the ADA are **GRANTED** (Docket Nos. 86, 105).

9. The defendants' motions for summary judgment and to strike jury demand for claims under the Rehabilitation Act are **DENIED** (Docket Nos. 86, 105). At trial at the conclusion of plaintiff's case-in-chief defendants are given leave to move to strike the jury should they so desire.

10. Plaintiffs Santiago Panzardi–Alvarez, Ana Hilda Santiago–Figueroa, Yilda Panzardi–Santiago and Gisela Panzardi–Santiago are **DISMISSED,** without prejudice (Docket No. 96).

11. The UPR's Motion to Dismiss Panzardi's supplemental claim is **GRANTED** (Docket No. 86).

12. Panzardi's Motion to Reinstate the supplemental claim is **DENIED** (Docket No. 96).

13. Panzardi is given ten (10) days from the date of this order to file a brief with this Court on the issue of why the Court should not dismiss all unserved defendants.

**SO ORDERED.**